[No. H035135. Sixth Dist. Dec. 16, 2010.]

SUNNYVALE WEST NEIGHBORHOOD ASSOCIATION et al., Plaintiffs and Respondents, v.
CITY OF SUNNYVALE CITY COUNCIL, Defendant and Appellant.

1356

**COUNSEL**

David E. Kahn, City Attorney, and Kathryn A. Berry, Assistant City Attorney; Barg Coffin Lewis & Trapp, Donald E. Sobelman, Kathryn L. Oehlschlager and Christopher D. Jensen for Defendant and Appellant.

Cox, Castle & Nicholson, Michael H. Zischke and Andrew B. Sabey for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

Kevin D. Allmand and Evelynn N. Tran for Santa Clara Valley Transportation Authority as Amicus Curiae on behalf of Defendant and Appellant.

Alexander T. Henson for Plaintiffs and Respondents.

## OPINION

**ELIA, J.**—In this California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] case, the superior court granted a peremptory writ of mandate compelling the City of Sunnyvale City Council (City Council) to set aside its October 28, 2008 approval of the proposed Mary Avenue Extension (MAE) Project and its certification of the final environmental impact report (FEIR). The FEIR used projected traffic conditions in the year 2020, based on expected growth under the City of Sunnyvale's general plan and in neighboring communities, as its "baseline" to evaluate the roadway project's traffic and related impacts. The FEIR did not consider the project's traffic and related impacts on the existing environment.

The City Council appeals, arguing that the EIR's "use of 2020 conditions as a baseline offers the most accurate and informative portrayal of the environmental impact of the MAE." Respondents Sunnyvale West Neighborhood Association and named individuals maintain that the impacts of the project must be measured against current, existing physical conditions and a comparison against "a baseline as it might exist in 2020 cannot substitute for a comparison with current, existing conditions."

We affirm.

### A. *Procedural History*

Respondents sought to compel the City Council to set aside its approval of the MAE project until a legally adequate EIR had been prepared and considered. Respondents filed a petition for writ of mandate, alleging, among other things, that the EIR prepared for the project was legally deficient because it used a 2020 "baseline" for assessing the project's impacts.

---

[1] All further statutory references are to the Public Resources Code unless otherwise specified. The administrative guidelines for implementing CEQA are set forth in title 14 of the California Code of Regulations, section 15000 et seq. and are statutorily authorized (see § 21083). "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 [53 Cal.Rptr.3d 821, 150 P.3d 709].) All references to the CEQA Guidelines are to the administrative regulations implementing CEQA.

The superior court granted the petition. It concluded that the administrative record did not contain substantial evidence supporting the city's decision to deviate from the normal procedure of using a baseline of current environmental conditions and to instead "use estimates of the conditions in the year 2020 that assumed a complete build-out of projects in the City's General Plan." The superior court further concluded that this decision "constituted a failure to proceed in the manner required by law." It determined that the "decision had the effect of minimizing potential project impacts on traffic, noise, and air quality and tainted the comparison of the proposed project with project alternatives."

The court stated that, under cited case law, deviation from normal procedures is limited to "unusual circumstances properly documented in an administrative record." It found that the situation in this case resembled the circumstances in *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683 [58 Cal.Rptr.3d 102] (*Woodward*).

In *Woodward*, the City of Fresno had approved new commercial development on vacant land based upon an EIR (environmental impact report) that "in many instances" "evaluate[d] environmental impacts by comparing the project's impacts with those of the maximum buildable development under existing zoning and plan designations." (*Woodward, supra*, 150 Cal.App.4th at p. 707.) The appellate court in *Woodward* agreed that the EIR would have been legally sufficient if it had "evaluated the proposed project's impacts in relation to *both* a vacant lot *and* a large development permissible under existing zoning and plan designations." (*Ibid.*) It also determined, inter alia, that "[t]he EIR's air pollution discussion" was inadequate because "[i]t proceed[ed] from the wrong environmental baseline, assessing the project's impacts as slight because they are not much greater than the impacts of a builtout development under preexisting zoning and plan designations." (*Id.* at p. 731.)

Here, the superior court further explained its decision: "The only grounds advanced by Respondent to justify the use of projections for the year 2020 as the environmental baseline in the EIR are that such projections are used by the Santa Clara Valley Transportation Authority ('VTA') in its Transportation Impact Analysis Guidelines (2004), as part of the VTA's responsibilities under the Congestion Management Law (Gov. Code, §§ 65088–65089.10), and that the proposed MAE would not be complete and in use until the year 2020. . . . As to the latter, there is not substantial evidence in the record establishing when the proposed project would be complete and statements by city personnel in the record are inconsistent. As to the former, efforts

undertaken by the VTA and local governments to comply with the Congestion Management Law are irrelevant to whether a proposed project complies with CEQA."[2] (Fn. omitted.)

The superior court in this case further stated that "[e]ven if Respondent's claim (presently unsupported by substantial evidence) that there is little or no practical difference in project impacts measured against present conditions versus 2020 estimates proves correct, that does not justify the decision to use 2020 as a baseline in the EIR without an analysis of present conditions." The court granted a peremptory writ of mandate, ordering the City Council to set aside its approvals of the MAE project and its certification of the FEIR and desist from any further action to approve the project without prior preparation and consideration of a legally adequate document using current conditions as a baseline.

## B. *Relevant Administrative Record*

### 1. *August 2007 Draft EIR*

The August 2007 draft EIR states that Mary Avenue presently extends north from Homestead Road in south Sunnyvale and terminates at Almanor Avenue just south of U.S. Highway 101; it provides local access to residential and commercial properties in Sunnyvale. The proposed project involves a four-lane northerly extension of Mary Avenue over U.S. Highway 101 and State Route 237 to Eleventh Avenue at E Street. It includes construction of a bridge over the two freeways and light-rail transit tracks. The stated objectives of the project are to provide an alternative "north-south connector to

---

[2] A county agency's congestion management program must contain "[a] program to analyze the impacts of land use decisions made by local jurisdictions on regional transportation systems . . . ." (Gov. Code, § 65089, subd. (b)(4).) A congestion management program must be submitted to the regional agency, which must "evaluate the consistency between the program and the regional transportation plans required pursuant to [Government Code] Section 65080." (Gov. Code, § 65089.2, subd. (a); see Gov. Code, § 65088.1, subd. (a).) Under Government Code section 65080, subdivision (a), each designated transportation planning agency must "prepare and adopt a regional transportation plan directed at achieving a coordinated and balanced regional transportation system, including, but not limited to, mass transportation, highway, railroad, maritime, bicycle, pedestrian, goods movement, and aviation facilities and services." The VTA's (Valley Transportation Authority) congestion management program contains Transportation Impact Analysis (TIA) Guidelines. Its TIA Guidelines state that "[t]ransportation impacts shall be evaluated for at least the following [four] study scenarios: existing conditions, background conditions (existing trips plus trips from approved developments in the area), project conditions (existing trips plus trips from approved developments in the area plus estimated project-generated trips), and near-term cumulative conditions (includes expected growth)." CEQA does not apply to "a congestion management program prepared *pursuant to Section 65089 of the Government Code*" (§ 21080, subd. (b)(13); see CEQA Guidelines, § 15276), but individual roadway projects remain subject to CEQA. The VTA's TIA Guidelines expressly state in italicized text: "*It is not intended that the TIAs will provide all the information required for California Environmental Quality Act (CEQA) purposes.*"

lands north of US 101 and SR 237 (including the Moffett Park area)" and to "[a]lleviate existing and future traffic congestion in the Moffett Park area and other areas adjacent to Mary Avenue."

The draft EIR separately discusses the project's impact in 12 categories, including but not limited to transportation, noise, and air quality.[3] It also contains sections on the project's growth-inducing impacts and cumulative impacts.

In the section concerning transportation impacts, the draft EIR describes the existing roadway network. It also contains tables indicating the existing traffic conditions in terms of the average traffic volume on particular roadway segments and the qualitative level of service (LOS)[4] at certain intersections and on certain freeway segments. The draft EIR then describes "future transportation conditions in the year 2020 in the project area without the proposed extension of Mary Avenue" using the city's traffic demand model. According to the draft EIR, this model "accounts for both existing traffic as well as future traffic based on the buildout of the land uses identified in the adopted Sunnyvale General Plan" and for "projected growth in neighboring jurisdictions" affecting traffic volumes on Sunnyvale streets. In analyzing the transportation impacts, the draft EIR assumes numerous roadway improvements in the project area to be in place by the year 2020 regardless of the proposed project.

Table 2.6 compares average daily trips (ADT's) on various segments of Mary Avenue and surrounding roadways. As to each roadway segment, it specifies the number of ADT's under current circumstances, under projected conditions in 2020 without the project, and under projected conditions in 2020 with the project. The table does not provide information about the ADT's under existing conditions with the project and therefore, no direct comparison can be made to the existing conditions without the project. The table states the percent change in traffic volume from the "2020 no project" scenario to the "2020 project" scenario. The draft EIR explains that the table's data indicates that the "future traffic volumes would be substantially greater than existing ADT volumes" and stated that "[s]uch increases are the result of planned growth in Sunnyvale and the surrounding areas" and "[t]his increase will occur irrespective of any decision to approve the proposed Mary Avenue Extension."

---

[3] Those areas of impact are land use, visual and aesthetics, transportation, noise, air quality, cultural resources, biological resources, geology and soils, hydrology and water quality, hazards and hazardous materials, utilities and service systems, and energy.

[4] The draft EIR defines "level of service" and explains "level of service" methodology. It states in part: "The operations of roadway facilities are described with the term Level of Service (LOS). LOS is a qualitative description of traffic flow based on such factors as speed, travel time, delay, and freedom to maneuver."

The draft EIR describes a number of thresholds of significance[5] with regard to transportation impacts, including the following two. It states that a transportation impact is significant if the project would "[c]ause an increase in traffic which is substantial in relation to the *existing traffic load* and *capacity of the street system* (i.e. result in a substantial increase in either the number of vehicle trips, the volume to capacity ratio on roads, or congestion at intersections)" or if the project would "[e]xceed, either individually or cumulatively, a level of service standard established by the county congestion management agency or the City of Sunnyvale for designated roads or highway." (Italics added.) The draft EIR emphasizes that the "proposed project is designed to accommodate existing and projected traffic demand" and "would not change overall traffic volumes in the area." It further states that "because the project consists of a new north-south roadway connection, its primary effect will be to change the traffic distribution in the area."

The draft EIR discusses the 2020 traffic volumes with the project and reiterates that "the project will redistribute traffic in the area since it will provide an alternative north-south connection across two major freeways." It notes that the major effects of the project in terms of increased traffic volume would occur on Mary Avenue north of Central Expressway and minimal change in traffic patterns are expected south of Central Expressway. In addition, it states that the project would cause some traffic to shift from Mathilda Avenue, a major north-south arterial roadway, to Mary Avenue. It indicates the project's impacts on traffic volume would not be significant.

The projected LOS's in 2020 with and without the project are compared to determine the impact on intersection operations. The draft EIR states, and the data reflects, that the project would generally improve intersection operations with some exceptions under 2020 conditions. The table comparing intersection LOS with and without the project in the year 2020 indicates minimal change on Mary Avenue at the Central Expressway intersection and at more southerly intersections. The draft EIR concludes that the project would cause a significant deterioration in operations at one intersection (Mary Avenue/Maude Avenue) during the p.m. peak hour. It identifies a mitigation measure to reduce that impact to a less than significant level. Otherwise, no significant transportation impacts are found.

---

[5] The CEQA Guidelines define "a threshold of significance" as "an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (CEQA Guidelines, § 15064.7, subd. (a).) The petition for writ of mandate does not challenge the adopted thresholds of significance or their general application.

The draft EIR's section regarding noise impacts explains that "[n]oise is measured on a 'decibel' scale." It states that "[f]or traffic noise, ten times as many vehicles per hour results in ten times as much sound energy, resulting in a ten-decibel increase, and perceived doubling of loudness" while "[t]wice as many vehicles per hour means twice the sound energy, resulting in a three-decibel increase, and a just-noticeable increase in loudness." It indicates that "[t]wenty-six percent more vehicles per hour" would result "in a one-decibel increase, usually considered to be an imperceptible increase in loudness." In addition, it explains: "The speed of traffic also affects noise levels: for every five mph increase in speed there is a 1 to 2-decibel increase in average noise levels."

The stated thresholds of significance for noise impacts include "[a] substantial permanent increase in ambient noise levels in the project vicinity above levels existing without the project." The draft EIR indicates that it is using the city's general plan definition of significant noise impact from new development, under which a project-caused noise increase of more than five dBA[6] is significant if existing and postproject noise levels are in the "normally acceptable" category and a project-caused noise increase of more than three dBA is significant if "the existing noise level on the site is in the 'normally acceptable' category but the post-project noise level on the site exceeds the 'normally acceptable' category" or if "the existing noise level on the site exceeds the 'normally acceptable' category . . . ."

The draft EIR describes the existing noise conditions and indicates ambient noise measurements were made. It states that "traffic-related noise exceeds the City's General Plan goal of having an outdoor $L_{dn}$ no greater than 60 dBA at residences."[7] A table summarizing ambient noise measurements taken in the project vicinity shows existing noise levels range from 64 to 69 dBA $L_{dn}$.

The draft EIR discusses the construction-related noise impacts in relation to the existing ambient noise environment. In assessing the long-term noise impacts, however, the draft EIR compares "future 2020 traffic volumes without the project and future 2020 traffic volumes with the project" and calculates "noise level increases resulting from the build-out of the General Plan and as a result of the project plus General Plan build-out." The draft EIR

---

[6] The noise assessment report, attached as appendix C to the draft EIR, explains that "[a] *decibel (dB)* is a unit of measurement which indicates the relative amplitude of a sound." The draft EIR indicates that sound levels adjusted or weighted to correspond to human hearing are measured in adjusted units "known as the 'A-weighted' decibel or dBA."

[7] According to the draft EIR, "$L_{dn}$ stands for Day-Night Level and is a 24-hour average of noise levels, with a 10 dB penalty applied to noise occurring between 10:00 PM and 7:00 AM."

considers the long-term noise impacts with regard to the "nearest residential receivers" for whom noise levels were expected to increase "about four to six dBA $L_{dn}$ by the year 2020" without the project. It concludes, based on future 2020 traffic volumes, that the proposed project "would be responsible for a traffic noise level increase by less than one dBA L[dn] *above the noise levels expected as a result of General Plan build-out*" (italics added), which "would not be measurable or perceptible, and would not exceed the significance criterion of three dBA L[dn] established by the City of Sunnyvale" and "[f]or this reason, project-generated traffic would not result in significant noise impacts."

As to air quality, the draft EIR explains that "[b]oth ozone and $PM_{10}$ [(particulate matter with a diameter of less than 10 micrometers)] are considered regional pollutants in that concentrations are not determined by proximity to individual sources." It recognizes that carbon monoxide is "a local pollutant because elevated concentrations are usually only found near the source." It reports that the Bay Area is considered in nonattainment for both ozone and $PM_{10}$. (particulate matter with a diameter of less than 10 micrometers).

The draft EIR sets forth thresholds of significance for air quality impacts.[8] In discussing long-term air quality impacts, the draft EIR explains that the "project would provide an alternative to the existing north-south connections in the City and help alleviate regional operation deficiencies." It states that "[t]he proposed project would accommodate existing and future traffic rather than generate traffic." The draft EIR finds no significant long-term air quality impacts for the following reasons. The first is that "[t]he proposed project would improve long-term air quality by providing an alternate north-south route of travel as well as alleviating congestion on existing north-south connections such as Mathilda Avenue." The second is that carbon monoxide would not "exceed standards along Mary Avenue" based on published data from the Bay Area Air Quality Management District (BAAQMD).

The draft EIR's discussion of growth-inducing impacts of the MAE project reports that "[t]he proposed project will likely have an indirect growth-inducing effect since it increases the capacity of the area's transportation

---

[8] For purposes of this project, an air quality impact is considered significant if the project would "[c]onflict with or obstruct implementation of the applicable air quality plan," "[v]iolate any air quality standard or contribute substantially to an existing or project air quality violation," "[r]esult in a cumulatively considerable net increase of any criteria pollutant for which the project region is in non-attainment under an applicable federal or state ambient air quality standard (including releasing emissions which exceed quantitative thresholds for ozone precursors)," "[e]xpose sensitive receptors to substantial pollutant concentrations," or "[c]reate objectionable odors affecting a substantial number of people." Residences located north of U.S. Highway 101 and east of Mathilda Avenue are identified as sensitive receptors near the project site.

network" and "[t]o the extent that the provision of an adequate transportation network is essential to growth, the lack of such capacity is a constraint to growth." It further states: "The environmental effects of growth would generally include increased traffic, noise, air pollution, and water pollution."

As to cumulative traffic impacts, the draft EIR states that the "proposed project would not generate any new traffic, and therefore, would not contribute to the cumulative increase in the traffic in the project area." It again indicates that the traffic analysis for the project had "utilize[d] the City's traffic forecasting model, which takes into account existing traffic, as well as any increases in traffic from future planned development" and states that this "methodology accounts for the effects of cumulative growth in the project area." As to cumulative noise impacts, the draft EIR states: "The largest source of increased noise in the immediate project area is motor vehicle traffic. Cumulative traffic-related noise will continue to increase as traffic volumes increase . . . ." The discussion regarding cumulative air quality impacts addresses the short-term construction-related air quality impacts but says nothing about the long-term cumulative impacts.

The draft EIR considers a number of alternatives to the proposed MAE project. The discussion regarding the "no project" alternative is brief, stating in summary that "although the No Project Alternative would avoid all significant environmental effects of the proposed project, it would not meet any of the project objectives." A table compares delay and LOS at various intersections under existing conditions without the project and under future traffic conditions in 2020 without the project, with the project, and with two alternatives.

## 2. *Peer Review*

The administrative draft FEIR was submitted for peer review to Amy Skewes-Cox, an environmental planner. She stated in a September 2, 2008 letter to Jack Witthaus, the transportation and traffic manager in the city's Department of Public Works, that her "greatest concern" was whether the EIR had adequately "evaluated the project's impacts as related to the 'existing condition.' " She stated: "Using the base year of 2020 can underestimate the impacts, especially if the project is constructed before that year. Project impacts should be more correctly shown in relation to current day conditions, especially as related to noise, air quality, and traffic. Any future comparisons (i.e. 2010 or 2020) could be additionally done, but should be secondary to comparing existing conditions." As to the provision of master responses to public comments in the FEIR, she advised: "A master response should also address the standards of significance for air quality impacts and the various thresholds. . . . If the City decides to compare project impacts to existing

conditions, there could be significant impacts with increased traffic on this corridor. If these cannot be mitigated, the City may need to make Findings of Overriding Consideration related to air quality impacts. (Note: the same may apply for noise impacts if this changed methodology occurs[.])" She also warned that "recirculation may be necessary because the 'Existing' condition should be the basis of comparison for the project and new, significant impacts may be identified."

Witthaus responded to the peer reviewer's comments in an October 18, 2008 letter. He explained: "The traffic impacts of the project were evaluated against future 'background' conditions in accordance with the procedures described in VTA's Transportation Impact Analysis Guidelines (2004). These guidelines were adopted for use by all of the cities in Santa Clara County. The guidelines state that projects should be compared to background conditions, which is defined as existing traffic plus traffic from approved projects. For an infrastructure improvement project such as the Mary Avenue Extension, 'approved' projects are those that will be constructed per the adopted land use plans of Sunnyvale and the surrounding jurisdictions. This approach is utilized because it provides full disclosure of the reasonably foreseeable consequences of a project such as the extension of Mary Avenue. [¶] The future horizon year of 2020 was chosen because it approximates the time when the Mary Avenue Extension, if approved, would be open to traffic. . . . [T]here is currently no funding for the project. Even assuming full funding becomes available in the next few years, an assumption which is questionable in the current transportation funding environment, it would take several years to design and construct the project." He also asserted: "The City believes that utilizing the 2020 scenario best describes the reasonably foreseeable consequences of the project, and better represents the true time frame that this project may be realized. It is also the approach outlined in VTA's guidelines for preparation of Transportation Impact Analyses."

Witthaus's response also included a table, which showed the average daily traffic volumes for segments of Mary Avenue and other affected roadways, with and without the project under current conditions, and which stated the percent change compared to the existing traffic volume. His letter explained that the table "shows how . . . traffic would be redistributed if the Mary Avenue Extension was in place today." The table showed the following percent increases in volume over the existing traffic volumes: 220 percent on Mary Avenue south of Almanor Avenue (resulting in more than three times existing volume), 94 percent on Mary Avenue north of Maude Avenue (resulting in close to two times existing volume), 23 percent on Mary Avenue south of Maude Avenue, 17 percent on Mary Avenue north of Central Expressway, and 75 percent on Almanor Avenue east of Mary Avenue (resulting in 1.75 times existing volume) if the project were built today. The table indicated that the project would additionally generate an average daily

traffic volume of 7,400 on the new Mary Avenue extension north of Almanor Avenue. The underlying methodology used to determine those figures was not explained. No data was presented regarding the project's impact on intersection delay or LOS under existing conditions without the other assumed roadway improvements.

Witthaus stated, under either the present scenario or the 2020 scenario, the project resulted in "notable changes in traffic volumes" to the same roadway segments. Without any supporting analysis, he stated that "comparing this 'Existing Condition + Project' scenario to the 'Existing' condition does not result in any significant traffic impacts."

As to noise, Witthaus responded that there were no residential streets where the project would result in a three dB increase in noise and, as to air quality, he indicated that "since the EIR concludes that the higher 2020 [traffic] volumes would not result in significant air quality impacts . . . the same conclusion can be reached for the data represented in the attached table."

By letter dated October 17, 2008, the peer reviewer replied. Although she expressed some understanding of Witthaus's rationale for using the 2020 traffic conditions, she stated that, based upon her CEQA experience, assessing project impacts in light of assumed "background" conditions rather than the "existing" conditions "may not comport with the CEQA Guidelines . . . ." She acknowledged that the city's methodology in selecting 2020 "would seem to comport with the VTA Guidelines," but she also stated, "while you have followed the VTA Guidelines for impact analyses, the adequacy of this under CEQA remains unclear."

This correspondence between Witthaus and the peer reviewer regarding the adequacy of the administrative draft FEIR was not included in the final version.

3. *Final EIR*

The FEIR includes the draft EIR, responses to comments received on the draft EIR, and revisions to the draft EIR. (See CEQA Guidelines, §§ 15132, 15362, subd. (b).) The EIR process provides for public review of a draft EIR and requires the lead agency to consider comments received during the public review period and provide written responses. (See §§ 21091–21092; CEQA Guidelines, §§ 15087–15088, 15105.)

A large number of comments express the view that the project's negative impacts on the residents and neighborhoods in the vicinity of Mary Avenue

had not been adequately considered. Many comments voice concern that the MAE project would reduce the quality of life for Sunnyvale residents in the vicinity of Mary Avenue as a result of increased traffic, noise, and air pollution.

Master response No. 1 discusses the origins of traffic growth due to planned development in the City of Sunnyvale and surrounding cities.

Master response No. 10 regarding air quality issues acknowledges that "[v]arious comments on the Draft EIR expressed concern that the project would result in significant air quality impacts to residents living along Mary Avenue" and "commentors questioned why a quantitative analysis was not undertaken for the Mary Avenue Extension to determine the extent to which such air quality impacts might occur." The response recognizes that "[w]ith regard to local pollutants, carbon monoxide (CO) is the pollutant of greatest concern because concentrations tend to be higher along major roadways." The response explains why a quantitative carbon monoxide analysis was not done for the MAE project. The reasons include the following: (1) the Bay Area is classified as an "attainment" area for carbon monoxide under the federal and state standards, (2) BAAQMD's published data show background concentrations of carbon monoxide are "sufficiently low" that it is unlikely that clear air act standards will be exceeded, (3) in 2006, the city determined that worst case carbon monoxide concentrations along Lawrence Expressway, described as a "roadway with traffic volumes and congestion substantially greater than Mary Avenue," would not exceed the federal or state standards, from which it is inferred that carbon monoxide standards would not be exceeded anywhere along Mary Avenue as a result of the project, and (4) carbon monoxide emissions will continue to decrease as older vehicles are replaced by newer and cleaner vehicles. The response reiterates that the MAE project "will not generate additional traffic in the Sunnyvale area" but "will provide additional capacity, which will reduce congestion." It is stated that "[a] reduction in congestion typically leads to a reduction in emissions because overall emissions are highest in idling and stop-and-go conditions."

Master response No. 11 addresses the issue of future traffic with regard to overall growth versus project impacts. It emphasizes that roadways do not create traffic but rather accommodate demand, and planned growth would cause an increase in overall traffic with or without the project. It explains that not building a planned roadway improvement would simply divert traffic to alternate streets. Other responses repeat that the project would not change overall traffic volumes because roadways accommodate traffic demand and do not create it but the responses recognize that the project would change traffic distribution in the area.

An individual response to a comment concerned with increased traffic congestion on Mary Avenue and the resulting pollution and noise reiterates that the MAE project will not cause overall traffic to increase but instead will provide an alternate to the existing north-south connections in the city and "help to alleviate regional deficiencies," which "will decrease overall congestion" and "reduce emissions as higher emissions are associated with congested conditions." Other responses addressing concerns with traffic on Mary Avenue indicate that Mary Avenue has been designated as a class 2 arterial in the city's general plan for many years rather than a local or collector roadway and that "[t]he General Plan Land Use and Transportation Element identifies the extension of Mary Avenue north of Almanor as one of the traffic improvements needed as mitigation for the buildout of the General Plan . . . ."

A response to a comment regarding the prospective increase in noise pollution states that the project will have a minimal effect on traffic volumes south of Central Expressway and refers to the draft EIR's table regarding traffic volumes (under 2020 conditions). It points out that the table shows that the project as compared to "no project" (both in the year 2020) "would result in the percentage changes of average daily trips of -3 percent to +4 percent for the portion of Mary Avenue south of Central Expressway." Another response explains that traffic-related impacts on the residential areas along the southerly portion of Mary Avenue "were not discussed since the project will have only a negligible effect on traffic volumes at that location . . . ." It states that the draft EIR indicates the project would result in a less than one decibel increase in noise for residences along Mary Avenue in the vicinity of Maude Avenue (above the noise resulting from projected traffic volumes in 2020).

Another response reiterates that "[t]he transportation impacts of the project were evaluated against 2020 No Project Conditions" and the "traffic volumes for the 2020 No Project conditions include future traffic anticipated from the buildout of the land uses designated in the General Plan . . . as well as projected growth in neighboring jurisdictions."

The text revisions to the draft EIR include adding additional information regarding the land use setting. A revision clarifies the locations of industrial and residential land uses along Mary Avenue. It makes clear that the predominant land use along Mary Avenue south of Central Expressway is residential. The table regarding traffic volumes, which shows the ADT's for segments of Mary Avenue and vicinity roadways, is revised to additionally state the percent change between the ADT's under existing conditions and under 2020 conditions without the project. The table indicates considerable increases in traffic on all segments by 2020 without the project, impliedly from other causes. Two additional alternatives to the proposed MAE project are added to the FEIR. The table comparing delay and LOS at certain

intersections is revised to add the two new alternatives (considered under future traffic conditions in 2020).

### 4. *Staff Report and Staff Presentation Before EIR Certification and Project Approval*

The staff report to appellant City Council for its October 28, 2008 meeting, at which the City Council certified the FEIR and approved the project, states, with regard to use of the 2020 traffic "baseline," that the peer reviewer was not familiar with the VTA's TIA standards and consequently could not come to a conclusion regarding CEQA compliance. The correspondence was provided as attachment H to the staff report.

On October 28, 2008, Witthaus gave an overview of the MAE project to the City Council. With respect to traffic issues, he stated: "Traffic modeling has been the focus of many questions. Forecasting was done using the City's computerized transportation model. This model uses land-use forecasts from the City Planning Department and from the Valley Transportation Authority's model for the rest of Santa Clara County and the Bay Area. . . . [¶] This model follows a methodology adopted by all Santa Clara County jurisdictions, as required by State Congestion Management Program Law. [¶] The City's model is approved for use by the Santa Clara Valley Transportation Authority, which is Santa Clara County's Congestion Management Agency, as required by state law." He further stated that traffic growth "occurs in Sunnyvale and on Mary Avenue with or without the Mary Avenue Extension" and the proposed project "relieves traffic congestion created by planned growth by creating new roadway capacity and shifting traffic flow" and "[i]t does not add new traffic to the overall roadway system, but rather, serves existing and forecast traffic on the roadway system."

Witthaus explained: "The traffic impacts of the Project were evaluated against future background conditions, in accordance with the procedures described in the Valley Transportation Authority's Transportation Impact Analysis Guidelines. These Guidelines were adopted for use by all cities in Santa Clara County. The Guidelines state that projects should be compared to background conditions, which is defined as 'existing traffic plus traffic from approved projects.' " He stated that "[t]he future horizon year of 2020 was chosen because it approximates the time when the Mary Avenue Extension, if approved, would be open to traffic. [¶] Currently, there is no construction funding available for the Project. Even assuming full funding becomes available in the next few years, an assumption which is questionable in the current transportation funding environment, it would take several years to design and construct the Project."

He disclosed that the city "did provide additional information on an 'existing condition plus project' scenario as a response to the Peer Review process that we went through." He told the City Council, as he had told the peer reviewer, there were no significant traffic, noise, or air quality impacts and repeated what he had told the peer reviewer. Witthaus explained the peer review process and represented that "[t]he Peer Reviewer has determined that the document and the City's response to the Peer Review appear to adequately disclose potential impacts."

Witthaus told the City Council that the MAE project is "integral to mitigating the traffic impact of planned development in the Moffett Industrial Park." He warned that there would be significant implications for the city's current land use plans and previously approved development projects and other problems if the city did not proceed with the project.

The City Council voted to certify the EIR and approve the MAE project.

## C. *Standard of Review*

In reviewing the agency actions under CEQA, this court's review extends "only to whether there was a prejudicial abuse of discretion." (§ 21168.5.) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid.*) "As a result of this standard, '[t]he court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].)" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].) "In the context of review for abuse of discretion, an agency's 'use of an erroneous legal standard constitutes a failure to proceed in a manner required by law.' (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 88 [118 Cal.Rptr. 34, 529 P.2d 66]; see also *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118 [104 Cal.Rptr.2d 326] ['questions of interpretation or application of the requirements of CEQA are matters of law'].)" (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 355–356 [46 Cal.Rptr.3d 355, 138 P.3d 692].) In contrast, the abuse of discretion standard "command[s] much deference to factual and environmental conclusions in the EIR based on conflicting evidence (e.g., *Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d 376, 393, 409) . . . ." (*Id.* at p. 355.)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the

same as the trial court's: [t]he appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th 412, 427; cf. *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479 [80 Cal.Rptr.3d 28, 187 P.3d 888].)

## D. *CEQA Requirements*

CEQA generally requires preparation and certification of an EIR on any proposed project that may have a significant effect on the environment before the project is approved.[9] (See §§ 21080, subd. (d), 21082.2, subd. (d), 21100, subd. (a), 21151; CEQA Guidelines, §§ 15064, subd. (a)(1), 15089–15090.) The EIR must include, among other things, a detailed statement setting forth "[a]ll significant effects on the environment of the proposed project." (§ 21100, subd. (b); see §§ 21061, 21065 [defining "project"], 21068 [defining "significant effect on the environment"]; see also CEQA Guidelines, §§ 15002, subd. (g) ["A significant effect on the environment is defined as a substantial adverse change in the physical conditions which exist in the area affected by the proposed project."], 15143 ["The EIR shall focus on the significant effects on the environment."], 15382 [defining "significant effect on the environment"].) "Environment" is defined as "the physical conditions which *exist* within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5, italics added; see § 21151, subd. (b); CEQA Guidelines, § 15360 [defining environment to mean "the physical conditions which exist within the area which will be affected by a proposed project . . ."].) "The 'environment' includes both natural and man-made conditions." (CEQA Guidelines, § 15360.) Significant effects on the environment are "limited to substantial, or potentially substantial, adverse changes in physical conditions which *exist* within the area as defined in Section 21060.5 [(defining "environment")]." (§§ 21100, subd. (d), italics added, 21151, subd. (b) [same].)

The implementing CEQA Guidelines state with regard to an EIR's description of a proposed project's environmental setting: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they *exist at the time the notice of preparation is published,* or if no notice of preparation is published, *at the time environmental analysis is commenced,* from both a local and regional perspective. This environmental

---

[9] "In evaluating the significance of the environmental effect of a project, the lead agency shall consider direct physical changes in the environment which may be caused by the project and reasonably foreseeable indirect physical changes in the environment which may be caused by the project." (CEQA Guidelines, § 15064, subd. (d).)

setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant."[10] (CEQA Guidelines, § 15125, subd. (a), italics added.)

With regard to an EIR's evaluation of a proposed project's significant impacts on the environment, the CEQA Guidelines state: "An EIR shall identify and focus on the significant environmental effects of the proposed project. In assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the *existing* physical conditions in the affected area as they *exist* at the time the notice of preparation is published, or where no notice of preparation is published, at the time environmental analysis is commenced. Direct and indirect significant effects of the project on the environment shall be clearly identified and described, giving due consideration to both the short-term and long-term effects." (CEQA Guidelines, § 15126.2, subd. (a), italics added.)

Case law makes clear that "[a]n EIR must focus on impacts to the existing environment, not hypothetical situations. (See *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 246–247 [227 Cal.Rptr. 899]; *Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 352–355 [182 Cal.Rptr. 317].)" (*County of Amador* v. *El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 955 [91 Cal.Rptr.2d 66].) "It is only against this baseline that any significant environmental effects can be determined. (Guidelines, §§ 15125, 15126.2, subd. (a).)" (*Id.* at p. 952.)

Recently, in *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310 [106 Cal.Rptr.3d 502, 226 P.3d 985] (*Communities for a Better Environment*), the Supreme Court concluded that the South Coast Air Quality Management District abused its discretion in evaluating a petroleum refinery project proposed by ConocoPhillips Company by using a "baseline" of the maximum operating capacity of the equipment under existing permits. (*Id.* at p. 316.) The district had "treated any additional NOx emissions stemming from increased plant operations within previously permitted levels as part of the baseline measurement for environmental review . . . ." (*Id.* at p. 318.) The court held that the district

---

[10] "Immediately after deciding that an environmental impact report is required for a project, the lead agency shall send to the Office of Planning and Research and each responsible and trustee agency a notice of preparation stating that an environmental impact report will be prepared. This notice shall also be sent to every federal agency involved in approving or funding the project." (CEQA Guidelines, § 15082, subd. (a).) "Within 30 days after receiving the notice of preparation . . . , each responsible and trustee agency and the Office of Planning and Research shall provide the lead agency with specific detail about the scope and content of the environmental information related to the responsible or trustee agency's area of statutory responsibility that must be included in the draft EIR." (CEQA Guidelines, § 15082, subd. (b).)

had "erred in using the boilers' maximum permitted operational levels as a baseline" because "operation of the boilers simultaneously at their collective maximum was not the norm." (*Id.* at p. 322.)

The Supreme Court stated: "By comparing the proposed project to what *could* happen, rather than to what was actually happening, the District set the baseline not according to 'established levels of a particular use,' but by 'merely hypothetical conditions allowable' under the permits. (*San Joaquin Raptor Rescue Center v. County of Merced* [(2007)] 149 Cal.App.4th [645,] 658 [57 Cal.Rptr.3d 663].) Like an EIR, an initial study or negative declaration 'must focus on impacts to the existing environment, not hypothetical situations.' (*County of Amador v. El Dorado County Water Agency, supra*, 76 Cal.App.4th at p. 955.)" (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 322.) It concluded that "the District's use of the maximum capacity levels set in prior boiler permits, rather than the actually existing levels of emissions from the boilers, as a baseline to analyze NOx emissions from the Diesel Project was inconsistent with CEQA and the CEQA Guidelines." (*Id.* at pp. 326–327.)

█ The Supreme Court explained: "An approach using hypothetical allowable conditions as the baseline results in 'illusory' comparisons that 'can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts,' a result at direct odds with CEQA's intent. (*Environmental Planning & Information Council v. County of El Dorado, supra*, 131 Cal.App.3d at p. 358.)" (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 322.) The court stated: "A long line of Court of Appeal decisions holds, in similar terms, that the impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis, rather than to allowable conditions defined by a plan or regulatory framework. This line of authority includes cases where a plan or regulation allowed for greater development or more intense activity than had so far actually occurred, as well as cases where actual development or activity had, by the time CEQA analysis was begun, already exceeded that allowed under the existing regulations. In each of these decisions, the appellate court concluded the baseline for CEQA analysis must be the 'existing physical conditions in the affected area' (*Environmental Planning & Information Council v. County of El Dorado, supra*, 131 Cal.App.3d at p. 354), that is, the ' "real conditions on the ground" ' (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra*, 87 Cal.App.4th at p. 121; see *City of Carmel-by-the-Sea v. Board of Supervisors, supra*, 183 Cal.App.3d at p. 246), rather than the level of development or activity that *could* or *should* have been present according to a plan or regulation." (*Id.* at pp. 320–321, fns. omitted.) The court cited *Woodward, supra*, 150 Cal.App.4th 683 (the case relied on by the trial court in the

present case) as one case example. (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 321, fn. 6.)

 The Supreme Court recognized, however, that some flexibility existed for the determination of baseline conditions. "Neither CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the *existing* conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the *existing* physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra*, 40 Cal.4th at p. 435.)" (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 328, italics added.) The court indicated that, since environmental conditions may vary from year to year, the baseline might take into consideration conditions that have existed over a range of time. (*Id.* at pp. 327–328.) "In some circumstances, peak impacts or recurring periods of resource scarcity may be as important environmentally as average conditions. Where environmental conditions are expected to change quickly during the period of environmental review for reasons other than the proposed project, project effects might reasonably be compared to predicted conditions at the expected date of approval, rather than to conditions at the time analysis is begun. ([*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra*, 87 Cal.App.4th at pp.] 125–126.) A temporary lull or spike in operations that happens to occur at the time environmental review for a new project begins should not depress or elevate the baseline; overreliance on short-term activity averages might encourage companies to temporarily increase operations artificially, simply in order to establish a higher baseline." (*Id.* at p. 328.) The Supreme Court never sanctioned the use of predicted conditions on a date subsequent to EIR certification or project approval as the "baseline" for assessing a project's environmental consequences.

As to the particular project at issue in *Communities for a Better Environment*, the Supreme Court recognized that "refinery operations fluctuate over time." (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 328.) But it made clear that, regardless of the method ultimately adopted, the district must compare "existing physical conditions" without the project to the conditions expected to be produced by the project because "[w]ithout such a comparison, the EIR will not inform decision makers and the public of the project's significant environmental impacts, as CEQA mandates. (§ 21100.)" (*Ibid.*)

 In addition to assessing potential significant effects, "[a]n EIR must include a description of feasible project alternatives that would substantially lessen the project's significant environment effects. (Pub. Resources Code,

§ 21061; Cal. Code Regs., tit. 14, § 15126.6, subds. (d), (f).)" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1167 [77 Cal.Rptr.3d 578, 184 P.3d 709]; see §§ 21061 [EIR "means a detailed statement setting forth the matters" specified in § 21100], 21100, subd. (b)(4) [EIR must include a detailed statement setting forth the alternatives to the proposed project]; CEQA Guidelines, § 15126.6, subd. (a) [EIR "must consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation"].) "Under CEQA, the range of alternatives that an EIR must study in detail is defined in relation to the adverse environmental impacts *of the proposed project.* . . . The project's environmental effects, in turn, are determined by comparison with the existing 'baseline physical conditions.' (Cal. Code Regs., tit. 14, § 15125, subd. (a); see *County of Amador v. El Dorado County Water Agency*[, *supra*,] 76 Cal.App.4th 931, 952 . . . .)" (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1167.)

The CEQA Guidelines require "[t]he specific alternative of 'no project' " to "be evaluated along with its impact." (CEQA Guidelines, § 15126.6, subd. (e)(1).) Those guidelines explain that the "purpose of describing and analyzing a no project alternative is to allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project." (*Ibid.*) The CEQA Guidelines clarify that "[t]he no project alternative analysis is not the baseline for determining whether the proposed project's environmental impacts may be significant, unless it is identical to the *existing* environmental setting analysis which does establish that baseline (see Section 15125)." (CEQA Guidelines, § 15126.6, subd. (e)(1), italics added.)

E. *Abuse of Discretion*

1. *Standard for Evaluating Determination to Use a 2020 "Baseline"*

"In evaluating an EIR for CEQA compliance, . . . a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra*, 40 Cal.4th at p. 435.) Appellant City Council insists that the decision to use a "baseline" of the traffic conditions projected for the year 2020 was a factually based discretionary determination, which "is supported by substantial evidence in the administrative record." We first examine whether that decision constituted a failure to proceed as required by law, as concluded by the superior court.

## 2. *Compliance with CEQA*

As clearly indicated by our overview of CEQA law, the baseline for assessing the impacts of a project is ordinarily the existing physical conditions in the affected area. The only cases cited by appellant to support the city's use of the traffic conditions predicted for the year 2020 as a "baseline" are *Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238 [82 Cal.Rptr.2d 436] (*Fairview Neighbors*) and *Save Our Peninsula Committee v. Monterey County Board of Supervisors, supra,* 87 Cal.App.4th 99 (*Save Our Peninsula*).

In *Fairview Neighbors, supra,* 70 Cal.App.4th 238, the Ventura County Board of Supervisors approved a conditional use permit (CUP) to expand the mining operation of a private company. The mine had been operating under a previously approved CUP and then, following expiration of that CUP, under a compliance agreement with the county while the county considered an application to modify the prior CUP. (*Id.* at pp. 240–241.) The appellants challenged the FEIR for the expanded mining operations, arguing that "the EIR arbitrarily and speculatively determined that the existing traffic limit is 810 truck trips, rather than the actual, existing traffic." (*Id.* at p. 242.) They asserted that "the EIR should have compared existing traffic without the mining operation against the 'new' proposal." (*Ibid.*)

The appellate court recognized that "[t]he flow of traffic for a mining operation fluctuates considerably based on need, capacity and other factors. [Citation.]" (*Fairview Neighbors, supra,* 70 Cal.App.4th at p. 243.) The expired CUP, which had been renewed in 1976 after preparation of an EIR, in effect permitted a daily average of 810 truck trips. (*Id.* at pp. 240–241, 243.) The mine had "generated 837 daily truck trips" during its peak operation in 1989. (*Id.* at p. 243.)

The appellate court reasoned that "[t]he ongoing mining operation is an existing facility and the instant situation is akin to ones in which categorical exemptions to CEQA have been granted. [Citations.]" (*Fairview Neighbors, supra,* 70 Cal.App.4th at p. 243.) It also stated that "[a] complete new EIR may not have been necessary here; a supplemental EIR, a narrowed EIR under the concept of 'tiering' or a partial exemption may have been reasonable here. [Citation.]" (*Ibid.*) The appellate court concluded that the FEIR "appropriately assumes the existing traffic impact level to be the traffic generated when the mine operates at full capacity pursuant to the entitlement previously permitted by CUP-1328, as extended by the compliance agreement." (*Fairview Neighbors, supra,* 70 Cal.App.4th at pp. 242–243.)

The *Fairview Neighbors* case and similar decisions were distinguished in *Communities for a Better Environment, supra,* 48 Cal.4th at page 326. The

California Supreme Court stated: "The District and ConocoPhillips cite several Court of Appeal decisions as supporting the use of maximum operational levels allowed under a permit, rather than existing physical conditions, as a CEQA baseline. In each of these decisions, however, the appellate court characterized the project at issue as merely a modification of a previously analyzed project and hence requiring only limited CEQA review under section 21166 and CEQA Guidelines section 15162 (Cal. Code Regs., tit. 14, § 15162), or as merely the continued operation of an existing facility without significant expansion of use and hence exempt from CEQA review under CEQA Guidelines section 15301 (Cal. Code Regs., tit. 14, § 15301), or both." (*Ibid.*, fn. omitted.) The project here was not previously analyzed under CEQA and is not entitled to a categorical exemption for existing facilities.

In *Save Our Peninsula, supra,* 87 Cal.App.4th 99, it was argued that the Monterey County Board of Supervisors acted within its discretion in selecting a particular formula for determining baseline water usage based on evidence contained in the EIR. (*Id.* at p. 119.) This court stated: "If the determination of a baseline condition requires choosing between conflicting expert opinions or differing methodologies, it is the function of the agency to make those choices based on all of the evidence. (*Barthelemy v. Chino Basin Mun. Water Dist.* [(1995)] 38 Cal.App.4th 1609, 1617 [45 Cal.Rptr.2d 688].) [¶] If an EIR presents alternative methodologies for determining a baseline condition, however, we believe CEQA requires that each alternative be supported by reasoned analysis and evidence in the record so that the decision of the agency is an informed one. We further find that the EIR must set forth any analysis of alternative methodologies early enough in the environmental review process to allow for public comment and response." (*Id.* at p. 120.) Although the issue was baseline water usage, this court in that case stated: "For instance, where the issue involves an impact on traffic levels, the EIR might necessarily take into account the normal increase in traffic over time. Since the environmental review process can take a number of years, traffic levels as of the time the project is approved may be a more accurate representation of the existing baseline against which to measure the impact of the project. [Citation.]"[11] (*Save Our Peninsula, supra,* 87 Cal.App.4th at pp. 125–126.) That dictum was impliedly approved by the California Supreme Court in *Communities for a Better Environment, supra,* 48 Cal.4th at page 328, when it suggested that the baseline might be the "predicted

---

[11] Appellant's statement in its opening brief that this court "directly addressed the baseline issue in the context of a traffic study" in *Save Our Peninsula* is misleading. The traffic issues in that case "center[ed] around the EIR recommending, and the Board adopting, the payment by the applicants of in-lieu fees into county traffic impact fee programs as mitigation for traffic increases attributed to the project." (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 135.)

conditions at the expected date of approval" "[w]here environmental conditions are expected to change quickly during the period of environmental review for reasons other than the proposed project . . . ."

But in *Save Our Peninsula, supra,* 87 Cal.App.4th 99, this court concluded that the EIR's baseline discussion of water usage was inadequate for a number of reasons. (*Id.* at p. 128.) This court observed: "[A]lthough the agency's factual determinations are subject to deferential review, questions of interpretation or application of the requirements of CEQA are matters of law. [Citations.] While we may not substitute our judgment for that of the decision makers, we must ensure strict compliance with the procedures and mandates of the statute. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].)" (*Id.* at p. 118.) The same is true here.

While *Communities for a Better Environment* endorsed the use of a baseline consisting of the reasonably foreseeable conditions on the expected date of project approval under limited circumstances (*Save Our Peninsula, supra,* 87 Cal.App.4th at pp. 125–126), the FEIR in this case did not use the anticipated traffic conditions on the expected date of project approval, which actually turned out to be October 28, 2008. Rather, the lead agency chose the projected conditions in the year 2020, more than a decade after approval, as the "baseline" against which to assess the traffic and related impacts of the proposed project.

■ Appellant City Council has not cited any decision upholding the use of a future "baseline" beyond the expected date of project approval. We do not construe the word "normally," as used in CEQA Guidelines section 15125, subdivision (a) (the "physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced" "normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant"), to mean that a lead agency has carte blanche to select the conditions on some future, postapproval date as the "baseline" so long as it acts reasonably as shown by substantial evidence.

■ It is important to keep in mind that the administrative regulations implementing CEQA (§ 21083) cannot contravene that governing statute (see Gov. Code, § 11342.2;[12] see also *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 105 [126

---

[12] Government Code section 11342.2 provides: "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or

Cal.Rptr.2d 441] [upholding invalidation of certain CEQA Guidelines]), which consistently requires a determination whether a project would significantly impact the *existing* environment. ▇ The word "normally" as used in the regulation is most reasonably understood as recognizing, with respect to individual projects not previously analyzed under CEQA, that the physical conditions existing exactly at the time the notice of preparation is published or at the time the environmental analysis begins (if a notice of preparation is not published) may not be representative of the generally existing conditions and, therefore, an agency may exercise its discretion to apply appropriate methodology to determine the "baseline" existing conditions. Thus, for example, if traffic congestion and vehicular travel have temporarily decreased due to an unusually poor economy so that traffic conditions at the time specified by CEQA Guidelines section 15125 are inconsistent with the usual historic conditions, a lead agency might use appropriate methodology, perhaps historical data and traffic modeling, to determine the generally existing conditions. Similarly, where evidence shows traffic levels are expected to increase significantly during the environmental review process due to other development actually occurring in the area, the projected traffic levels as of the expected date of project approval may be the appropriate baseline. (See *Communities for a Better Environment, supra*, 48 Cal.4th at p. 328; *Save Our Peninsula, supra*, 87 Cal.App.4th at pp. 125–126.)

Appellant suggests that the MAE project is different from other development projects because it is not a "traffic generator" but rather a "traffic congestion-relief project." But appellant has not pointed to anything in CEQA, the implementing administrative guidelines, or case law that permits a roadway infrastructure project to be evaluated differently than other projects. The statute requires the impact of any proposed project to be evaluated against a baseline of existing environmental conditions (see §§ 21060.5, 21100, subd. (d), 21151, subd. (b); see also CEQA Guidelines, § 15125, subd. (a)), which is the only way to identify the environmental effects specific to the project alone.

Although "[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the *existing* conditions baseline" (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 328, italics added), nothing in the law authorizes environmental impacts to be evaluated only against predicted conditions more than a decade after EIR certification and project approval. The amici curiae briefs filed by the League of California Cities and the California State Association of Counties and by the VTA in support of appellant do not supply any authority authorizing the use of such a future, postapproval "baseline." Use of such a "baseline," cannot be upheld

---

effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute."

since that approach contravenes CEQA regardless of whether the agency's choice of methodology for projecting those future conditions is supported by substantial evidence. The "industry practice" of evaluating transportation improvement projects based on future scenarios does not alter CEQA's mandates.

This is not to say, however, that discussions of the foreseeable changes and expected future conditions have no place in an EIR. To the contrary, such discussions may be necessary to an intelligent understanding of a project's impacts over time and full compliance with CEQA.

Although "[in] assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area . . . ," the EIR must still clearly identify and describe the "[d]irect and indirect significant effects of the project on the environment" and give "due consideration to both the short-term and long-term effects." (CEQA Guidelines, § 15126.2, subd. (a).) Further, "[w]here a proposed project is compared with an adopted plan, the [EIR's] analysis shall examine the *existing physical conditions* at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced *as well as the potential future conditions discussed in the plan.*" (CEQA Guidelines, § 15125, subd. (e), italics added.)

An EIR must "discuss cumulative impacts of a project when the project's incremental effect is cumulatively considerable," which "means that the incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects."[13] (CEQA Guidelines, §§ 15130, subd. (a), 15065, subd. (a)(3); see Pub. Resources Code, § 21083, subd. (b)(2).) An adequate discussion of significant cumulative impacts ordinarily includes either "[a] list of past, present, and probable future projects producing related or cumulative impacts" or "[a] summary of projections contained in an adopted local, regional or statewide plan, or related planning document, that describes or evaluates conditions contributing to the cumulative effect." (CEQA Guidelines, § 15130, subd. (b)(1).) "Previously approved land use documents, including, but not limited to, general plans . . . , may be used in cumulative impact analysis" in an EIR. (§ 21100, subd. (e); see CEQA Guidelines, § 15130, subd. (d).)

---

[13] "The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (CEQA Guidelines, § 15355, subd. (b).)

Appellant's and the VTA's contention that use of existing traffic conditions as a "baseline" in this case may understate traffic-related impacts and the VTA's suggestion that use of a future "baseline" may place a greater burden on the lead agency to mitigate are red herrings. "An EIR should not discuss impacts which do not result in part from the project evaluated in the EIR." (CEQA Guidelines, § 15130, subd. (a)(1).) But an EIR must discuss the cumulative impact of a project when the project has any "cumulatively considerable" incremental effect and it must "examine reasonable, feasible options for mitigating or avoiding the project's contribution to any significant cumulative effects." (CEQA Guidelines, § 15130, subds. (a), (b)(5).)

 Increased future traffic expected to result from planned growth under approved general plans should also come to light in the EIR's discussion of the "no project" alternative. An EIR's "no project" analysis must "discuss the *existing* conditions at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, *as well as what would be reasonably expected to occur in the foreseeable future* if the project were not approved, based on current plans and consistent with available infrastructure and community services." (CEQA Guidelines, § 15126.6, subd. (e)(2), italics added.) "[W]here failure to proceed with the project will not result in preservation of existing environmental conditions, the analysis should identify the practical result of the project's non-approval and not create and analyze a set of artificial assumptions that would be required to preserve the existing physical environment." (CEQA Guidelines, § 15126.6, subd. (e)(3)(B).)

 The EIR must provide sufficient information for meaningful evaluation of the comparative merits of the proposed project and each alternative. (See CEQA Guidelines, § 15126.6, subd. (d).) "Drafting an EIR . . . necessarily involves some degree of forecasting" and "an agency must use its best efforts to find out and disclose all that it reasonably can." (CEQA Guidelines, § 15144.) We see no problem with evaluating the project and each alternative under existing conditions and reasonably foreseeable conditions where helpful to an intelligent understanding of the project's environmental impacts. (See CEQA Guidelines, § 15125, subd. (e); see also *Woodward, supra,* 150 Cal.App.4th at p. 707.)

There is no doubt that comprehensive regional transportation planning must look at the big picture and take the long view. But we emphasize that the methodologies for forecasting traffic conditions and planning sound transportation systems and projects are not being challenged here. Once a specific roadway project is proposed and becomes the subject of an EIR under CEQA, however, a straightforward assessment of the impacts produced by the project alone on the existing environment is the foundational information of an EIR even where secondary analyses are included. Nothing prevents

an EIR from also examining a project's beneficial impacts over time, if reasonably foreseeable, but it must be remembered that the purpose of an EIR is to avoid or lessen each significant environmental effect of a proposed project whenever feasible. (See § 21002.1, subds. (a), (b).)

 Further, it must be recognized that a roadway infrastructure project aimed at reducing regional traffic and related problems might still have growth-inducing impacts with indirect adverse impacts on the environment and might also result in adverse environmental impacts in the immediate vicinity of the project, such as a localized increase in traffic problems, noise or air pollutants, which may only become apparent when the project is evaluated directly against existing conditions. Even when such localized significant effects are uncovered, the lead agency may ultimately determine that the project's overriding benefits from a long-term, regional transportation point of view outweigh any unavoidable localized significant environmental effect.[14] "CEQA requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits, including region-wide or statewide environmental benefits, of a proposed project against its unavoidable environmental risks when determining whether to approve the project. If the specific economic, legal, social, technological, or other benefits, including region-wide or statewide environmental benefits, of a proposal project outweigh the unavoidable adverse environmental effects, the adverse environmental effects may be considered 'acceptable.'" (CEQA Guidelines, § 15093, subd. (a).) "A statement of overriding considerations reflects the final stage in the decisionmaking process by the public body." (*Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1222 [13 Cal.Rptr.2d 182].)

 In this case, however, the decision makers and the public lacked complete information because an improper baseline was used for determining traffic and related impacts. This constituted a failure to proceed in the manner required by law.

F. *No Substantial Evidence*

Even if we were to assume that the decision to use projected 2020 conditions as a "baseline" did not constitute a failure to proceed in a manner required by law (a proposition to which we do not subscribe), the administrative record does not contain substantial evidence to support the decision to deviate from the norm. In response to the peer reviewer's concern that the

---

[14] CEQA Guidelines provide: "When a final EIR identifies one or more significant effects, the lead agency . . . shall make a finding under Section 15091 [(possible mitigation findings)] for each significant effect and may need to make a statement of overriding considerations under Section 15093 for the project." (CEQA Guidelines, § 15064, subd. (a)(2).)

EIR used the projected 2020 conditions as a "baseline" instead of using existing conditions, Witthaus stated that "[t]he future horizon year of 2020 was chosen because it approximates the time when the Mary Avenue Extension, if approved, would be open to traffic" since there was no current funding for the project and "[e]ven assuming full funding becomes available in the next few years, an assumption which is questionable in the current transportation funding environment, it would take several years to design and construct the project." He made the same comments to the City Council on October 28, 2008. These remarks do not constitute substantial evidence.

"Substantial evidence" is defined in the CEQA Guidelines as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a).) Substantial evidence does not include speculation or unsubstantiated opinion. (*Ibid.*) Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (CEQA Guidelines, § 15384, subd. (b).) Witthaus's comments indicate that the year of anticipated project completion was merely a guesstimate.[15]

The evidence that the city was relying on the VTA's TIA Guidelines is not substantial evidence supporting its decision to deviate from the normal existing conditions baseline. Appellant acknowledges in its reply brief that those guidelines did not require the city to use a 2020 "baseline" for CEQA purposes. As we have noted, the VTA Guidelines warn that the TIA's are not intended to cover the requirements of CEQA.[16] Appellant nevertheless argues that VTA's TIA Guidelines "reinforce the sound principle . . . that regional traffic planners should account for future growth in a project area when assessing a traffic infracture's [*sic*] project's environmental impact." We again state that there is no issue in this appeal concerning the propriety of the methodology used to predict the traffic conditions in the year 2020 or the use of the VTA's TIA Guidelines to plan the proposed roadway project.

## G. *Standard of Prejudice*

"Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown. (§ 21005, subd. (b).)"[17]

---

[15] The staff report prepared for the October 28, 2008 City Council meeting stated that the project design phase had been fully funded and that, "should the project be approved, staff estimates that construction could be complete within 5–10 years."

[16] See *ante*, footnote 2.

[17] Section 21005, subdivision (b), provides: "It is the intent of the Legislature that, in undertaking judicial review pursuant to Sections 21168 and 21168.5, courts shall continue to follow the established principle that there is no presumption that error is prejudicial."

(*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391 [133 Cal.Rptr.2d 718].) Section 21005, subdivision (a), states: "The Legislature finds and declares that it is the policy of the state that noncompliance with the information disclosure provisions of this division which precludes relevant information from being presented to the public agency, or noncompliance with substantive requirements of this division, may constitute a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions."

In *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215 [32 Cal.Rptr.2d 19, 876 P.2d 505], Pacific Lumber Company refused to provide information regarding the presence of old-growth-dependent wildlife species within the old-growth forest covered by proposed timber harvesting plans submitted for approval to the Department of Forestry and Fire Protection. (*Id.* at p. 1219.) The California Supreme Court concluded that the State Board of Forestry abused its discretion "when it evaluated and approved [Pacific Lumber Company's timber harvesting] plans on the basis of a record which lacked information regarding the presence in the subject areas of some old-growth-dependent species, information which both the [Departments of Forestry and Fire Protection] and Fish and Game had determined was necessary." (*Id.* at p. 1220.) The court stated: "By approving the plans without the necessary information regarding those species the board failed to comply with the obligation imposed on it by the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)" and another statute. (*Ibid.*)

The Supreme Court concluded that "[t]he failure of the board to proceed as required by law was prejudicial." (*Sierra Club v. State Bd. of Forestry, supra,* 7 Cal.4th at p. 1236.) It explained that "[t]he absence of any information regarding the presence of the four old-growth-dependent species on the site" "made any meaningful assessment of the potentially significant environment impacts of timber harvesting and the development of site-specific mitigation measures impossible." (*Id.* at pp. 1236–1237.) The court stated that "[i]n these circumstances prejudice is presumed. (See *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 174 [258 Cal.Rptr. 147]; *Rural Landowners Assn. v. City Council* (1983) 143 Cal.App.3d 1013, 1023 [192 Cal.Rptr. 325].)" (*Id.* at p. 1237.)

In *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra,* 44 Cal.4th 459, the California Department of Forestry and Fire Protection failed to consider some public comments regarding Pacific Lumber Company's sustained yield plan (SYP). (*Id.* at p. 482.) The Supreme Court considered the rule, articulated in *Rural*

*Landowners Assn. v. City Council, supra,* 143 Cal.App.3d 1013, that an error consisting of a failure to comply with CEQA is prejudicial where it results in a subversion of the purposes of CEQA by omitting information from the environmental review process. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra,* 44 Cal.4th at p. 486.) The Supreme Court stated that the "rule emerges out of the difficulty courts have in assessing the effects of the omitted information, much of it generally highly technical, on the ultimate decision." (*Ibid.*) It recognized that "[a] trial court's 'independent judgment that the information was of "no legal significance" amounts to a *"post hoc* rationalization" of a decision already made, a practice which the courts have roundly condemned.' (*Rural Landowners Assn., supra,* 143 Cal.App.3d at p. 1021.)" (*Ibid.*) But the court also recognized that insubstantial or de minimis errors in the CEQA process are not prejudicial. (*Environmental Protection Information Center,* at p. 486; see *id.* at p. 487, fn. 10.)

The Supreme Court stated: "If it is established that a state agency's failure to consider some public comments has frustrated the purpose of the public comment requirements of the environmental review process, then the error is prejudicial. (See *Sierra Club, supra,* 7 Cal.4th at pp. 1236–1237; *Rural Landowners Assn., supra,* 143 Cal.App.3d at pp. 1022–1023.)" (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra,* 44 Cal.4th at p. 487.) In that case, however, the department's failure to consider public comments was not prejudicial because the unconsidered comments were merely duplicative of other comments that had been considered. (*Id.* at pp. 487–488.) The court stated: "[W]hen a SYP or EIR is challenged for failing to consider comments alleged to contain significant new information, it is the burden of the agency that erroneously omitted the comments to establish they are merely duplicative" unless "their duplicative nature essentially is not contested . . . ." (*Id.* at p. 488.)

Use of an incorrect baseline for assessing the impacts of a proposed project is generally treated as a prejudicial abuse of discretion. (See, e.g., *Communities for a Better Environment, supra,* 48 Cal.4th 310; *Save Our Peninsula, supra,* 87 Cal.App.4th at pp. 119–128, 143.) In this case, however, appellant urges us to conclude that there was no prejudice because the project's traffic and related impacts were evaluated under future traffic conditions much worse than those presently existing, which appellant asserts resulted in a "more conservative and realistic" assessment and overstated the adverse effects of the project. This contention has some surface appeal but must be rejected upon closer examination.

First, in support of this claim, appellant merely points to Witthaus's own remarks to the peer reviewer and to appellant City Council explaining why

the 2020 horizon was chosen as the basis of comparison. This contention is simply a repackaging of the argument that the projected 2020 traffic conditions, predicated on certain assumptions, was an appropriate "baseline." It does not establish that the decision makers and ordinary citizens were provided with the essential information regarding the project's traffic and related impacts on the existing environment.

Second, appellant's argument does not respond to the problem that the EIR fails to identify and consider the *incremental* effects of the MAE project, individually, on the existing traffic, noise, and air quality conditions. The EIR instead evaluates any *incremental* change in those conditions due to the project against the already worse traffic environment of the future. Evaluation of the MAE project under those projected worse traffic conditions of the future obscures the existence and severity of adverse impacts that would be attributable solely to the project under the existing conditions without the other assumed roadway improvements. While appellant maintains that use of the predicted traffic conditions in the year 2020 caused the project's adverse environmental impacts to be overestimated, that conclusion is not self-evident from the FEIR.[18]

Alternatively, appellant insists that the city did analyze the traffic and related impacts of the project on the existing environment and presented that information to appellant City Council and the public prior to EIR certification. The appellate record shows that the internal correspondence with the peer reviewer was not incorporated into the FEIR and was merely one of many attachments to the staff report provided to the City Council for the October 28, 2008 meeting, at which the project was approved. Witthaus's response to the peer reviewer's concerns about the chosen "baseline" included a revised table of average daily traffic volumes with columns for "existing" and "existing plus project" (not included in the FEIR), which was unaccompanied by any analysis, and his conclusory assertion that the table disclosed no significant traffic impacts even though the table showed considerable increases in traffic along Mary Avenue north of Central Expressway and along Almanor Avenue east of Mary Avenue. In addition, that table's data is unsubstantiated in contrast to the draft EIR's transportation discussion, which is based on a traffic operations report completed by transportation consultants in April 2007 and attached to the document as an appendix.

---

[18] Appellant also asserts that "use of the current conditions baseline understates the positive environmental impacts . . . that will be realized when the Project is actually completed." If the assumptions underlying its traffic analysis based on the projected future traffic conditions are not realized, the EIR may overstate the project's future benefits. In any event, as our discussion regarding CEQA requirements indicates, the full picture provided by an EIR includes reasonably foreseeable future conditions but the foundational information of an EIR is its assessment of the project's impact on existing conditions.

■ " 'To facilitate CEQA's informational role, the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions.' (*Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029]; *People* v. *County of Kern* [(1974)] 39 Cal.App.3d 830, 841–842 [115 Cal.Rptr. 67] [conclusory statements fail to crystallize issues]; see also *Citizens for Quality Growth* v. *City of Mount Shasta* [(1988)] 198 Cal.App.3d 433, 441 [243 Cal.Rptr. 727] [agency's findings under § 21081 as to mitigation must be sufficiently detailed].)" (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at pp. 404–405.) "[T]he public and decisionmakers, for whom the EIR is prepared, should . . . have before them the basis for [an agency's] opinion so as to enable them to make an independent, reasoned judgment." (*Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 831 [173 Cal.Rptr. 602].) In addition, information introduced at the end of the environmental review process without analysis or the benefit of public scrutiny or participation does not fulfill the informational function of an EIR. (See *Save Our Peninsula, supra*, 87 Cal.App.4th at pp. 124–128.) An EIR "must present information in such a manner that the foreseeable impacts of pursuing the project can actually be understood and weighed, and the public must be given an adequate opportunity to comment on that presentation before the decision to go forward is made." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra*, 40 Cal.4th at pp. 449–450.) Appellant has failed to demonstrate that adequate information regarding the project's traffic and related impacts on the existing environment was properly presented to the general public and decision makers in the EIR process. (Cf. *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra*, 44 Cal.4th 459, 488 [burden on agency to establish lack of prejudice].)

" '[T]he conventional "harmless error" standard has no application when an agency has failed to proceed as required by the CEQA.' (*Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 897–898 [236 Cal.Rptr. 794].)" (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist., supra*, 210 Cal.App.3d at p. 174.) Thus, even if a complete analysis of the project's traffic and related impacts on the existing environment would have produced no findings of different or greater significant environmental effects than the city found based on the anticipated traffic conditions in 2020 and such analysis would not have altered the City Council's decisions, such circumstances do not establish a lack of prejudice for purposes of CEQA review. (See *Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 492–493 [82 Cal.Rptr.2d 705]; *Rural Landowners Assn. v. City Council, supra*, 143 Cal.App.3d 1013, 119–121, 123.) As the California Supreme Court has stated, "courts are

generally not in a position to assess the importance of the omitted information to determine whether it would have altered the agency decision, nor may they accept the post hoc declarations of the agencies themselves. (*Rural Landowners Assn., supra*, 143 Cal.App.3d at p. 1021.)" (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection, supra*, 44 Cal.4th at p. 487, fn. omitted.) A "determination of whether omitted information would have affected an agency's decision" is "highly speculative, an inquiry that takes the court beyond the realm of its competence." (*Id.* at p. 488.) Consequently, the appellant's repeated assertion that the EIR's assessment of traffic and related impacts using only the 2020 "baseline" resulted in a more conservative and realistic analysis, than would the omitted assessment using a proper baseline, is unavailing.

We also reject appellant's attempt to characterize the failure to use the proper baseline as a mere "immaterial, technical error." The underlying assumptions of the traffic-related analyses, that the city's general plan was completely built out, a number of anticipated roadway improvements were in place, and traffic volumes had reached the level predicted for the year 2020, made it impossible for decision makers and the general lay public to readily grasp the traffic and related impacts of the project itself on the environment as it presently exists.

One of the EIR's stated thresholds of significance states that a transportation impact is considered significant if the project would "[c]ause an increase in traffic which is *substantial in relation to the existing* traffic load and capacity of the street system (i.e., result in a substantial increase in either the number of vehicle trips, the volume to capacity ratio on roads, or congestion at intersections)." (Italics added.) While the EIR describes the existing roadway network and the existing traffic volume on certain roadway segments and the existing LOS at certain intersections, the EIR does not use the existing conditions as its baseline and, consequently, fails to answer how and to what extent the proposed project itself would adversely change the existing traffic conditions *without* those other roadway improvements assumed to be in place by the year 2020. How would the project change the delay and LOS at the various intersections under the existing conditions? Would the project alone substantially increase existing traffic volumes on certain roadway segments or substantially increase the existing traffic congestion and delay at certain intersections? The FEIR does not address those questions.

The EIR describes the existing noise conditions in the project vicinity and indicates that the noise sub-element of the city's general plan states the noise goal of "[p]reserv[ing] and enhance[ing] the quality of neighborhoods by maintaining or reducing the levels of noise generated by transportation facilities" and the noise policy to "[r]efrain from increasing or reduce the

noise impacts of major roadways." One of the thresholds of significance for noise provides that a noise impact would be considered significant if the project would result in "[a] *substantial* permanent increase in ambient noise levels in the project vicinity above levels *existing* without the project."[19] (Italics added.) The EIR sets out the relationship between noise and traffic but, without an accurate assessment of the traffic impacts of the project alone on the existing environment, it does not make plain whether the project's traffic-related noise impacts on the existing environment would reach the stated thresholds of significance. Nowhere in the FEIR is the impact of the project measured against the baseline of the existing ambient noise levels in the project vicinity.

The FEIR also fails to describe existing air quality conditions, either quantitatively or qualitatively, in the affected local area. The EIR indicates that the project would cause traffic volumes to increase along some stretches of Mary Avenue, on Almanor Avenue east of Mary Avenue, and on Maude Avenue under future traffic conditions in 2020 and, obviously, the project would bring new vehicular traffic onto the extended portion of Mary Avenue. It also reports that the project, while generally improving traffic delay at intersections, would cause delay during peak hour operations to worsen at certain intersections under future traffic conditions.[20] Carbon monoxide is identified in the draft EIR as a local pollutant found near the source, impliedly vehicular, and the FEIR discloses that "overall emissions are highest in idling and stop-and-go conditions." One of the EIR's thresholds of significance states that an air quality impact is considered significant if the project would "[e]xpose sensitive receptors to substantial pollutant concentrations." The EIR describes "sensitive receptors" and states that "[s]ensitive receptors near the project site include the residences located north of US 101 and east of Mathilda Avenue." Yet, the FEIR does not define "substantial pollutant concentrations" and does not disclose whether the adverse traffic changes resulting from the project alone would cause any adverse localized changes to the *existing* air quality that would meet articulated thresholds of significance.

 Local changes to the existing environment resulting from the project were of utmost importance to the local area residents and should have been spelled out by the FEIR. Decision makers and members of the public are not

---

[19] This stated threshold of significance is not expressly limited to sensitive receptors or area residents.

[20] A table in the EIR shows the project causing delay to worsen during a.m. and/or p.m. *peak hours* and the LOS to drop at various intersections under 2020 conditions. The peer reviewer told Witthaus that it was "hard to imagine that no CO emissions would occur" at "intersections where traffic increases up to 300%." At one intersection delay would increase by more than 300 percent and at another intersection would increase by almost 300 percent with the project under 2020 conditions.

required to ferret out information or make their own deductions regarding whether the project would significantly affect the existing environment. (See *San Joaquin Raptor Rescue Center v. County of Merced, supra*, 149 Cal.App.4th at p. 659; *Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 911 [100 Cal.Rptr.2d 173].)

Further, the EIR's discussion of cumulative traffic and related impacts seems to have been skewed by the use of a future "baseline," which already incorporated increased future traffic, build out of the city's general plan and completion of certain anticipated roadway improvements. Although the EIR acknowledges that expansion of the capacity of the area's transportation network may have an indirect growth-inducing effect and "[t]he environmental effects of growth would generally include increased traffic, noise, air pollution, and water pollution," the EIR's cumulative impacts analysis does not discuss whether any of the project's incremental effects are cumulatively considerable when the project is considered together with other projects that cause related impacts.[21] (See CEQA Guidelines, §§ 15130, 15355.)

■ Finally, the comparative merits of the project and each alternative, including the "no project" alternative, cannot be accurately compared if the proposed project's significant effects have not been fully ascertained and disclosed in the first place. To achieve the purposes of CEQA, the discussion of alternatives must "focus on alternatives to the project or its location which are capable of avoiding or substantially lessening any significant effects of the project" "[b]ecause an EIR must identify ways to mitigate or avoid the significant effects that a project may have on the environment (Public Resources Code Section 21002.1) . . . ." (CEQA Guidelines, § 15126.6, subd. (b); see Pub. Resources Code, § 21002.1, subd. (a) [purpose of an EIR]; see also § 21060.5 ["environment" means existing physical conditions]; CEQA Guidelines, § 15360 [same].) While the city can be credited with expanding the number of alternatives, lay readers cannot ascertain from the FEIR whether a comparison of the alternatives would yield different results if the impacts of the alternatives on the existing environment were considered. (See CEQA Guidelines, § 15126.6.) Thus, the FEIR did not present the full picture.

We can only imagine that the city was so focused on the future regional transportation benefits of the project that it failed to adequately evaluate the

---

[21] We recognize, however, that "[n]o further cumulative impacts analysis is required when a project is consistent with a general, specific, master or comparable programmatic plan where the lead agency determines that the regional or areawide cumulative impacts of the proposed project have already been adequately addressed, as defined in section 15152(f) [(tiering)], in a certified EIR for that plan." (CEQA Guidelines, § 15130, subd. (d).) The FEIR does not state this to be the case.

traffic and related impacts on the existing environment. While the analyses using the projected traffic conditions in 2020 certainly add valuable information to the EIR, they are not a substitute for evaluating the project's traffic and related impacts on the existing conditions.

The omitted information and discussions are essential to a basic understanding whether the project itself would result in any significant environmental impact in terms of traffic volume, delay, congestion, and levels of service, ambient noise, and air quality as compared to the existing conditions. Without a straightforward assessment of the project's full impact on existing conditions, the EIR process does not serve its core informational purpose.

■ "The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting " 'not only the environment but also informed self-government." ' ([*Citizens of Goleta Valley v. Board of Supervisors, supra*, 52 Cal.3d 553,] 564 . . . .)" (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1162.) Further, "[b]esides informing the agency decision makers themselves, the EIR is intended 'to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its actions.' [Citations.]" (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 136 [84 Cal.Rptr.3d 614, 194 P.3d 344].) Decision makers and ordinary citizens should not be left wondering whether the project itself would significantly impact the existing environment. (See *Woodward, supra*, 150 Cal.App.4th at p. 709.)

"The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial. (*Sierra Club v. State Bd. of Forestry*[, *supra*,] 7 Cal.4th 1215, 1236–1237 . . . ; *Fall River Wild Trout Foundation v. County of Shasta*[, *supra*,] 70 Cal.App.4th 482, 491–493 . . . ; *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650]; *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.*[, *supra*,] 210 Cal.App.3d 155, 174 . . . ; *Rural Landowners Assn. v. City Council*[, *supra*,] 143 Cal.App.3d 1013, 1021–1023 . . . .)" (*County of Amador v. El Dorado County Water Agency, supra*, 76 Cal.App.4th at p. 946.) We agree with the superior court's statement that the EIR, by using future traffic conditions as its "baseline," "did not adequately explain to an engaged public how the proposed project was expected to change the present conditions in which they currently lived."

The judgment granting a writ of mandate is affirmed. Appellant shall bear costs on appeal.

Rushing, P. J., and Premo, J., concurred.