Filed 2/4/22  East Meadow Action Committee v. The Regents of the University of Cal. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| EAST MEADOW ACTION COMMITTEE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al,<br><br>    Defendants and Respondents;<br><br>CAPSTONE DEVELOPMENT PARTNERS LLC, et al,<br><br>    Real Parties in Interest and Respondents. | H048695<br>(Santa Cruz County<br> Super. Ct. No. 19CV01312) |

## I.  INTRODUCTION

This case arises from the proposal of the University of California, Santa Cruz  (UC Santa Cruz), to build new student housing in accordance with the 2005 long range development plan (LRDP) for the campus.  The 2005 LRDP was accompanied by the 2005 program environmental impact report (EIR) that was prepared pursuant to CEQA[1] to evaluate the environmental effects of the campus growth anticipated in the 2005

---

[1]  California Environmental Quality Act, Public Resources Code section 21000, et seq.  All further statutory references are to the Public Resources Code unless otherwise indicated.

LRDP.  In 2019, respondents the Regents of the University of California (Regents) approved the Student Housing West [SHW] project, which included building family student housing on a portion of the UC Santa Cruz campus known as the East Meadow. The project-level EIR for the SHW project was tiered from the 2005 LRDP program EIR.

East Meadow Action Committee, "an unincorporated association of current and former [UC Santa Cruz] staff, students, and alumni, as well as residents and taxpayers of and within the City of Santa Cruz and the County of Santa Cruz," challenged the Regents' approval of the SHW project by filing a petition for writ of mandamus alleging violations of CEQA's requirements for environmental review.

The trial court granted the petition for writ of mandamus to the extent it asserted that the Regents' findings regarding the infeasibility of the SHW project alternatives did not comply with CEQA, and denied the petition as to all other claims of CEQA violations.  The court ordered that a peremptory writ of mandate issue directing the Regents to correct the CEQA error regarding the infeasibility of the project alternatives, and staying all SHW project activities until the error is corrected.

In its appeal, East Meadow Action Committee contends that the trial court erred because :  (1) tiering the SHW project EIR from the 2005 LRDP program EIR was improper; (2) the SHW project EIR failed to analyze cumulative impacts; and (3) the trial court improperly limited the scope of the peremptory writ of mandate.  For the reasons stated below, we find no merit in these contentions and we will affirm the judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The 2005 LRDP*

As stated in the 2005 LRDP,[2] the 2005 LRDP "provides a comprehensive framework for the physical development of the UC Santa Cruz campus over a 15-year

---

[2]  "The University of California is required periodically to develop a comprehensive, long-range development plan . . . to guide development for each campus, based on the academic goals and projected enrollment for that campus.  (Ed. Code,

period.  It includes a land-use map to guide capital construction and infrastructure development to accommodate a building program for campus growth.  The 2005 LRDP accommodates a projected fall-winter-spring average student enrollment of up to 19,500 students through 2020 (an increase of approximately 5,100 over the 2003–04 total enrollment), with associated increases in faculty and staff."[3]  The development of additional student housing, including housing for undergraduate and graduate students, as well as family student housing, was anticipated.

The land use designations included in the 2005 LRDP include academic core, campus support, colleges and student housing, employee housing, physical education and recreation, campus resource land, campus natural reserve, site research and support, protected landscape, and campus habitat reserve.

Relevant here, the designation "campus resource land" is described in the 2005 LRDP as follows:  "This land-use designation is assigned to lands that are not planned for development under the 2005 LRDP.  It is envisioned that these lands would be maintained in their natural state to serve as long-term reserve lands for future use.  In the event that the campus determines during the term of the 2005 LRDP that it needs to develop some portion of this land, it will conduct additional environmental review and will seek an LRDP amendment."

---

§ 67504, subd. (a)(1).)  Under section 21080.09, the development plan must be analyzed in an environmental impact report (EIR) under CEQA.  (§ 21080.09, subd. (b).)"  (*Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 231.)

[3] This  court previously noted that "[i]n or about 2005 UCSC approved a long-range development plan that called for a significant expansion of its student population and the addition of 3,175,000 gross square feet of building space.  Concerned about the impact the proposed expansion would have upon City [of Santa Cruz] services, City and others attacked the plan with lawsuits of their own.  In August 2008 those actions were resolved by a comprehensive settlement agreement."  (*Community Water Coalition v. Santa Cruz County Local Agency Formation Com.* (2011) 200 Cal.App.4th 1317, 1321.)

"Family student housing" is described in the 2005 LRDP as "serv[ing] undergraduate and graduate student couples with and without children, as well as single parents. . . . Existing family student housing facilities (199 units) have reached the end of their lifespan as determined by extensive structural analysis and need replacement. Phased redevelopment of this area is projected during this LRDP to provide improved replacement facilities and better utilization of the site. Additional family student housing units may be developed in other locations, preferably on the west side in the vicinity of existing facilities."

Regarding the portion of the UC Santa Cruz campus known as the East Meadow, the 2005 LRDP states that "[n]ew development in the lower East Meadow between Hagar Drive and Coolidge Drive will be minimized to maintain the overall sense of an open meadow landscape."

## B. *The Program EIR*

The 2005 LRDP was accompanied by a draft program EIR that assessed the potentially significant environmental effects of the campus growth anticipated in the 2005 LRDP.[4] The draft program EIR stated that the anticipated campus growth included "an increase in enrollment and increased academic and research activities at [UC Santa Cruz] to meet the projected educational and research demand through academic year 2020-21."

---

[4] "A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [¶] (2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (Cal. Code Regs. tit. 14, § 15168.) "The regulations that guide the application of CEQA are set forth in title 14 of the California Code of Regulations and are often referred to as the CEQA Guidelines. [Citation.]" (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1561, fn. 5; hereafter CEQA Guidelines or Guidelines.)

More specifically, the draft program EIR noted that "[t]o accommodate the projected growth in enrollment and research activities, the 2005 LRDP accommodates a building program that envisions the development of an additional 2.6 million gross square feet (gsf2) of academic and support space on the campus, and the development of 1.5 million gsf of housing, which would provide an additional 3,390 student bed spaces and 125 units of employee housing on campus."

The draft program EIR also included a project-level assessment of the environmental impact of three specific projects, including the "Family Student Housing Redevelopment Project." Under this project, "UC Santa Cruz proposes to demolish the existing 199-unit family student housing complex on Heller Drive on the main campus, and to redevelop the site with 400 apartment units. . . ." The proposed site of the redeveloped family student housing complex was the 25-acre existing site, which is "located near the western edge of the campus south of Porter College, on the west side of Heller Drive, just inside the west entry to the campus."

In its discussion of landscape and open space, the draft program EIR stated that the East Meadow was a valued natural feature on the campus and was designated as a scenic resource. The draft EIR also stated that "[t]here would be no new development in the lower East Meadow, to further maintain the overall sense of an open meadow landscape."

In 2006, the Regents certified the 2005 final program EIR and approved the 2005 LRDP. The final program EIR did not include any "refinements" to the family student housing project analyzed in the draft program EIR and a recirculated draft program EIR.

**C.** *The Proposed Student Housing West Project and Project EIR*

In 2014, UC Santa Cruz began planning the SHW project, which included the development of 3000 beds of additional student housing to, among other things, meet the projected demand for student housing on campus. In 2017, UC Santa Cruz issued

5

requests for proposals from private entities to design, construct and maintain the proposed SHW project in a private-public partnership known as a P3. UC Santa Cruz then selected P3 partners, Capstone Development Partners LLC (the project developer) and Collegiate Housing Foundation (ground lease), with a plan to develop student housing on two sites, including the majority of the housing on a site west of Heller Drive (the Heller site) and a smaller number of student housing units on a second site at the intersection of Coolidge and Hagar Roads (the Hagar site in the East Meadow).

In November 2017 UC Santa Cruz issued a revised notice of preparation for the proposed SHW project EIR. The draft project EIR for the SHW project was issued in 2018 and subsequently replaced by a revised draft EIR (RDEIR). The RDEIR states that it is tiered from the 2005 LRDP EIR and relies on the 2005 LRDP EIR for (1) "A discussion of general background and setting information for environmental topic areas;" (2) "Overall growth-related issues;" (3) "Issues that were evaluated in sufficient detail in the 2005 LRDP EIR for which there is no significant new information or change in circumstances that would require further analysis; and (4) "An assessment of cumulative impacts."

The project description in the RDEIR states that the portion of the SHW project proposed for the 13-acre Heller site includes "the demolition of the existing [family student housing] complex and the construction of new housing, parking, and other support spaces. The proposed project would construct five buildings with apartments and co-housing style units that would provide approximately 2,712 undergraduate student beds." Additionally, the Heller site would include a sixth building providing approximately 220 beds for graduate students, as well as support facilities, administrative services, and various amenities.

The portion of the SHW project proposed for the 17-acre Hagar site includes construction of a new family student housing complex consisting of two-story townhouses providing approximately 140 student beds, plus a playground, community

6

center, childcare center, a maintenance building, and parking. The project description for the Hagar site also states that "[t]he development of student housing on the Hagar site would require an amendment of the 2005 LRDP to change the land use designation of the site from Campus Resource Land to Colleges and Student Housing."

The environmental impacts of the proposed SHW project and the mitigation measures were discussed in detail in the RDEIR. In summary, the RDEIR stated that it "concludes that implementation of the proposed project would result in significant or potentially significant impacts in eight resource areas: aesthetics, air quality; biological resources; cultural resources; geology and soils; hydrology and water quality; transportation and traffic; and utilities. With four exceptions, all of the significant and potentially significant impacts of the proposed project would be reduced to a less than significant level with the incorporation of LRDP and project-specific mitigation measures into the proposed project. The exceptions would be significant and unavoidable project impacts in the area of aesthetics on scenic vistas, scenic resources, and visual character/quality, and a significant and unavoidable impact on water supply."

Regarding the Hagar site, the RDEIR further concluded that "implementation of the project would substantially degrade the visual character or quality of the Hagar site, that no mitigation was feasible," and that the impact was "significant and unavoidable." The RDEIR also analyzed seven project alternatives for the SHW project, including a no project alternative, that did not involve development of the Hagar site.

The final EIR (FEIR) for the SHW project was released in 2019. The FEIR includes the RDEIR, the comments received on the RDEIR and a list of the commenters, the responses of the UC Santa Cruz as the lead agency to significant environmental points raised in the review and consultation process, and other information added by UC Santa Cruz.

**D.** *The Regents' Approval of the Project*

At a public meeting held in March 2019 regarding the SHW project, the Regents' Finance and Capital Strategies Committee was asked to recommend the following actions to the Regents, as recommended by the President of UC Santa Cruz:  (1) certify the EIR; (2) adopt the mitigation monitoring and reporting program and the CEQA findings and the statement of overriding considerations;[5] (3) approve amendment No. 2 to the 2005 LRDP to change the land use designation of the 17-acre Hagar site from Campus Resource Land to Colleges and Student Housing; and (4) approve the design of the SHW project.

The Finance and Capital Strategies Committee then recommended that the Regents take all four actions on the SHW project as recommended by UC Santa Cruz, with the exception that item No. 4 was revised as follows:  "Approve the design of the Student Housing West project, Santa Cruz campus, subject to approval by Regents Makarechian, Cohen, and Park to confirm the price of the other alternatives within two weeks."

On March 14, 2019, the Regents certified the EIR, adopted the mitigation and reporting system, adopted the CEQA findings and statement of overriding considerations, approved amendment No. 2 to the 2005 LRDP to change the land use designation of 17 acres of campus resource land to colleges and student housing; and "[a]pproved the design of the [SHW project], subject to approval by Regents Makarechian, Cohen, and Park to confirm the price of the other alternatives within two weeks."

---

[5]  The statement of overriding considerations concludes that "[c]onsidering all factors and the evidence in the EIR and other relevant documents, The Regents finds that specific economic, legal, social, technological, and other benefits of the [SHW] Project outweigh the significant and unavoidable adverse environmental impacts of the [SHW] Project.  The Regents therefore finds that those significant adverse impacts are acceptable in the context of the overall Project benefits."

8

The record reflects that on March 29, 2019, the Regents approved the design of the SHW project after receiving cost estimates for the project alternatives.

## E. *Writ Proceedings*

### 1. Petition for Writ of Mandate

The East Meadow Action Committee filed a petition for writ of mandamus naming the Regents and UC Santa Cruz as respondents and Capstone Development Partners LLC and Collegiate Housing Foundation as real parties in interest. In its petition, the East Meadow Action Committee sought a writ of mandamus setting aside the respondents' approvals of the SHW project and amendment No. 2 to the 2005 LRDP.

The East Meadow Action Committee stated in its petition that it objected to the development of the East Meadow, which it described "as an iconic gateway to [UC Santa Cruz] and embodies the values and beauty of the [UC Santa Cruz] Main Campus." The East Meadow Action Committee also claimed that the SHW project would destroy over 20 percent of the East Meadow to construct a small amount of family student housing.

The following claims of CEQA violations were raised by the East Meadow Action Committee in its writ petition: (1) EIR failed to adequately consider feasible alternatives to the SHW project; (2) the Regents failed to consider alternatives that would avoid significant impacts to the East Meadow: (3) the EIR failed to adequately analyze or mitigate the significant environmental impacts of the project, including impacts to grassland species; (4) the EIR erroneously relies on the 2005 LRDP EIR, which did not consider impacts to the East Meadow; (5) the SHW project conflicts with the physical design framework for the UC Santa Cruz campus; (6) the EIR failed to adequately evaluate impacts to hydrology and water quality; (7) the EIR does not contain a legally adequate cumulative impacts analysis; (8) respondents failed to provide adequate mitigation to reduce the impacts of the SHW project to less than significant, and (9) respondents did not adequately respond to comments.

9

## 2. The Trial Court's Statement of Decision

By the time of the hearing on the merits of the writ petition, the CEQA issues had been narrowed to the following: (1) whether the SHW project EIR was improperly tiered from the 2005 LRDP program EIR; (2) whether the SHW project EIR failed to include an analysis of cumulative impacts; (3) whether the SHW project EIR failed to conduct a proper alternatives analysis at the EIR and final agency approval stages; and (4) whether the SHW project was approved and the statement of overriding considerations adopted without the Regents being provided with the necessary public information to make an informed finding on the infeasibility of the project alternatives.

After holding further hearings on the matter, the trial court issued a statement of decision on the petition for writ of mandate on October 30, 2020. The trial court's rulings in the statement of decision rejected all but one of East Meadow Action Committee's claims of CEQA violations, as follows.

Regarding the claim that the SHW project EIR was improperly tiered from the 2005 LRDP program EIR, the trial court found that the SHW project EIR could be tiered because the amendment to the 2005 LRDP redesignated the Hagar site and the statutory scheme allows tiering from a broad program EIR where a site-specific analysis is conducted for the portions of a project not adequately addressed in the program EIR.

The trial court further found that the cumulative impacts analysis in the SHW project EIR for the Hagar site was adequate because the SHW project EIR acknowledged that the 2005 LRDP and the 2005 LRDP EIR did not include development of the Hagar site and included an analysis of the cumulative impacts of the project, including substantial evidence in the response to comments and the administrative record regarding the cumulative impact on biological resources.

As to the alternatives analysis, the trial court first found that the alternatives analysis in the SHW project EIR was adequate under the CEQA. However, the trial court then ruled that the Regents had violated CEQA by improperly rejecting the alternatives to

10

SHW project as economically infeasible on the basis of a non-public cost analysis that was delegated to a three-member committee. The trial court therefore granted the petition for writ of mandate to the extent it asserted that the Regents' findings regarding the infeasibility of the SHW project alternatives did not comply with CEQA.

### 3. Judgment and Peremptory Writ of Mandate

The judgment granting in part and denying in part the East Meadow Action Committee's petition for writ of mandate was entered on October 30, 2020. The petition was granted as to the claim that the Regents had violated CEQA and denied as to all other claims.

The judgment also ordered that a peremptory writ of mandate issue directing respondents to "to set aside the following actions, resolutions; and orders: (a) The March 14, 2019 adoption of the CEQA Findings and Statement of Overriding Considerations approving the Student Housing West Project at University of California, Santa Cruz by the Regents of the University of California, as made final on March 27, 2019; [¶] (b) The March 14, 2019 adoption of the Mitigation Monitoring and Reporting program for the Student Housing West Project, as made final on March 27, 2019; [¶] (c) The March 14, 2019 approval of the design of the Student Housing West Project, as made final on March 27, 2019."

Additionally, the judgment ordered that "[t]he peremptory writ of mandate shall require the Regents as, a whole, prior to reconsidering approval of the Project and in accordance with the requirements of CEQA, to consider any information regarding the feasibility of alternatives, including economic information, and take such into account in reconsidering approval of the Student Housing West Project."

### III. DISCUSSION

East Meadow Action Committee raises three CEQA issues on appeal: (1) tiering the SHW project EIR from the 2005 LRDP program EIR was improper; (2) the SHW project EIR failed to analyze cumulative impacts; and (3) the trial court improperly

11

limited the scope of the peremptory writ of mandate. We will begin our evaluation with an overview of the principles that guide our review of the CEQA issues.

## A. *Overview of CEQA Principles*

The California Supreme Court has provided an overview of CEQA principles: " 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' [Citations.] 'With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]' [Citation; see Guidelines, § 15002, subd. (f).) The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' (Pub. Resources Code, § 21061; see Guidelines, § 15003, subds. (b)-(e).) 'Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.' [Citation.] The EIR "protects not only the environment but also informed self-government.' [Citation.]" (*Sierra Club v. City of Fresno* (2018) 6 Cal.5th 502, 511-512, fn. omitted (*Sierra Club*).)

Thus, "[a]s this court has observed, 'the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage. [Citation.]' [Citation.]" (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 687.)

**B.** *Standard of Review*

"In a CEQA case, the appellate court's review 'is the same as the trial court's: [It] reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' [Citation.]" (*Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495 (*Protecting Our Water*).)

Accordingly, "[t]he reviewing court independently determines whether the record 'demonstrates any legal error' by the agency and deferentially considers whether the record 'contains substantial evidence to support [the agency's] factual determinations.' [Citation.]" (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 495.) " 'Substantial evidence challenges are resolved much as substantial evidence claims in any other setting: a reviewing court will resolve reasonable doubts in favor of the administrative decision, and will not set aside an agency's determination on the ground that the opposite conclusion would have been equally or more reasonable. [Citations.]' " (*Sierra Club*, *supra*, 6 Cal.5th at p. 515.) "If the agency's determination 'involves pure questions of law, we review those questions de novo.' [Citation.]" (*Protecting Our Water*, *supra*, 10 Cal.5th at p. 495.)

" 'Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise.' [Citation.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 987.)

**C.** *Tiering*

East Meadow Action Committee contends that respondents violated CEQA by tiering the SHW project EIR from the 2005 LRDP program EIR. We will begin our evaluation of this contention with an overview of EIR tiering under CEQA.

13

### 1. Tiering Under CEQA

The Legislature has authorized public agencies to tier EIRS, as set forth in section 21093.[6] "Unlike '[p]roject EIR[s],' which 'examine[ ] the environmental impacts of a specific development project' (CEQA Guidelines, § 15161), the CEQA provisions governing tiered EIRs 'permit[] the environmental analysis for long-term, multipart projects to be "tiered," so that the broad overall impacts analyzed in an EIR at the first-tier programmatic level need not be reassessed as each of the project's subsequent, narrower phases is approved.' [Citation; see CEQA Guidelines, § 15152 [' "Tiering" refers to using the analysis of general matters contained in a broader EIR (such as one prepared for a general plan or policy statement) with later EIRs and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the later project.'].)" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 959.)

The Legislature also has authorized tiering of EIRs by public institutions of higher education, as stated in section 21080.09, subdivision (c): "The approval of a project on a particular campus or medical center of public higher education is subject to this division and may be addressed, subject to the other provisions of this division, in a tiered

---

[6] Section 21093 provides that "(a) The Legislature finds and declares that tiering of environmental impact reports will promote construction of needed housing and other development projects by (1) streamlining regulatory procedures, (2) avoiding repetitive discussions of the same issues in successive environmental impact reports, and (3) ensuring that environmental impact reports prepared for later projects which are consistent with a previously approved policy, plan, program, or ordinance concentrate upon environmental effects which may be mitigated or avoided in connection with the decision on each later project. The Legislature further finds and declares that tiering is appropriate when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports. [¶] (b) To achieve this purpose, environmental impact reports shall be tiered whenever feasible, as determined by the lead agency."

14

environmental analysis based upon a long range development plan environmental impact report."

Thus, as the California Supreme Court has instructed, "[u]nder CEQA's tiering principles, it is proper for a lead agency to use its discretion to focus a first-tier EIR on only the general plan or program, leaving project-level details to subsequent EIR's when specific projects are being considered. (See [Guidelines], § 15152, subd. (b).)[7] This type of tiering permits a lead agency to use a first-tier EIR to adequately identify 'significant effects of the planning approval at hand' while deferring the less feasible development of detailed, site-specific information to future environmental documents. (See *id.*, § 15152, subd. (c)." (*In re Bay-Delta etc*. (2008) 43 Cal.4th 1143, 1174-1175; see also Guidelines § 15385 [definition of tiering].)

However, as this court has noted, under section 21094, subdivision (b)[8] tiering "applies only to a later project which the lead agency determines (1) is consistent with the program, plan, policy, or ordinance for which an environmental impact report has been

_____

[7] Guidelines, § 15152, subdivision (b) provides in part: "Agencies are encouraged to tier the environmental analyses which they prepare for separate but related projects including general plans, zoning changes, and development projects. This approach can eliminate repetitive discussions of the same issues and focus the later EIR or negative declaration on the actual issues ripe for decision at each level of environmental review. Tiering is appropriate when the sequence of analysis is from an EIR prepared for a general plan, policy, or program to an EIR or negative declaration for another plan, policy, or program of lesser scope, or to a site-specific EIR or negative declaration."

[8] Section 21094, subdivision (b) provides: "Where a prior environmental impact report has been prepared and certified for a program, plan, policy, or ordinance, the lead agency for a later project that meets the requirements of this section shall examine significant effects of the later project upon the environment by using a tiered environmental impact report, . . . . [¶] This section applies only to a later project that the lead agency determines is all of the following: [¶] (1) Consistent with the program, plan, policy, or ordinance for which an environmental impact report has been prepared and certified. [¶] (2) Consistent with applicable local land use plans and zoning of the city, county, or city and county in which the later project would be located. [¶] (3) Not subject to Section 21166."

15

prepared and certified, (2) is consistent with applicable local land use plans and zoning of the city . . . in which the later project would be located, and (3) is not subject to Section 21166 [EIR required when substantial changes in the project require major revisions of a previously-prepared EIR]."[9]  (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App. 4th 911, 927-928, fn. 13 (*Gilroy Citizens*).)

### 2.  The Parties' Contentions

East Meadow Action Committee contends that respondents violated CEQA by tiering the SHW project EIR from the 2005 LRDP program EIR because the SHW project is not consistent with the 2005 LRDP.  According to East Meadow Action Committee, the SHW project is inconsistent because it is not within the "development footprint" of the 2005 LRDP and required an amendment to the 2005 LRDP to enable development.  Further, East Meadow Action Committee argues that under the 2005 LRDP development of the East Meadow is inconsistent with the planning principles stated in the 2005 LRDP, and, in particular, the principle of maintaining open space and meadows on the UC Santa Cruz campus.

East Meadow Action Committee also argues that the amendment to the 2005 LRDP to change the land use designation for the Hagar site in the East Meadow from campus resource land to colleges and student housing constitutes a change in the project that requires preparation of a subsequent or supplemental EIR under section 21166.

---

[9]  Section 21166 provides:  "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:  [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.  [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.  [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

16

Respondents argue to the contrary that the SHW project is consistent with the 2005 LRDP due to the amendment changing the land use designation of the Hagar site to colleges and student housing. According to respondents, because the LRDP is analogous to a general plan, and an amendment to an LRDP is similar to rezoning, tiering is therefore proper under Guidelines section 15152, subdivision (e), which provides: "Tiering under this section shall be limited to situations where the project is consistent with the general plan and zoning of the city or county in which the project is located, except that a project requiring a rezone to achieve or maintain conformity with a general plan may be subject to tiering."

Respondents also maintain that the SHW project is consistent with the planning principles articulated in the 2005 LRDP with respect to the East Meadow because the family student housing portion of the project is low density and will be located "adjacent to existing housing and two roadways, and leaving the vast majority of the East Meadow undisturbed."

Finally, respondents assert that the SHW project EIR was properly tiered from the 2005 LRDP program EIR because the SHW project EIR included a project-level analysis of environmental impacts that were not addressed in the 2005 LRDP program EIR, including "Aesthetics, Agriculture and Forest Resources, Air Quality, Biological Resources, Land Use and Planning, Noise, Population and Housing, Public Services, Cultural Resources, Geology and Soils, Greenhouse Gas Emissions, Hydrology and Water Quality, Transportation and Traffic Utilities and Service Systems, Tribal Cultural Resources, and Energy."

### 3. Analysis

In the present case, we will independently determine whether tiering the SHW project EIR from the 2005 LRDP program EIR constitutes legal error under CEQA, since the essential facts are undisputed. (See *Protecting Our Water*, *supra*, 10 Cal.5th at p. 495.)

17

To begin with, one of the purposes of the 2005 LRDP was to plan for the development of the UC Santa Cruz campus to accommodate growth in campus enrollment through 2020. The campus development anticipated in the 2005 LRDP expressly included developing additional student housing for undergraduates, graduate students, and students with families. The 2005 LRDP specifically stated that the development plan included replacement of existing family student housing and the development of additional family student housing in other locations on campus. Therefore, development of family student housing on the Hagar site, as analyzed in the SHW project EIR, is consistent with the 2005 LRDP as it pertains to family student housing.

We also note that the East Action Meadow Committee does not dispute that the 2005 LRDP designated the Hagar site—the portion of the East Meadow where the family student housing proposed in the SHW project will be located—as campus resource land. Notably, the Hagar site was not designated either campus natural reserve, protected landscape, or campus habitat reserve. "Campus resource land" is expressly defined in the 2005 LRDP as "lands that are not planned for development under the 2005 LRDP. It is envisioned that these lands would be maintained in their natural state to serve as long-term reserve lands for future use. In the event that the campus determines during the term of the 2005 LRDP that it needs to develop some portion of this land, it will conduct additional environmental review and will seek an LRDP amendment."

Here, respondents determined, consistent with the 2005 LRDP, that it needed to develop a portion of campus resource land located on the Hagar site in order to develop family student housing, prepared a project-level EIR (the SHW project EIR) to conduct additional environmental review, and sought an amendment to the 2005 to change the land use designation of the Hagar site from campus resource land to colleges and student housing. Moreover, as we have noted, the 2005 LRDP contemplated some development in the vicinity of the Hagar site, as follows: "New development in the lower East

18

Meadow between Hagar Drive and Coolidge Drive will be minimized to maintain the overall sense of an open meadow landscape." Thus, the record shows that SHW project is consistent with the 2005 LRDP within the meaning of section 21094, subdivision (b).

We are also not convinced by East Meadow Action Committee's argument that the amendment to the 2005 LRDP to change the land use designation for the Hagar site in the East Meadow from campus resource land to colleges and student housing constitutes a change in the project that requires preparation of a subsequent or supplemental EIR under section 21166. As we have discussed, changing the land use designation of campus resource land to allow development was expressly contemplated in the 2005 LDRP.

For these reasons, we determine that respondents did not err in tiering the SHW project EIR from the 2005 LRDP program EIR. As our Supreme Court has stated, "[t]iering is properly used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 431.)

### C. *Cumulative Environmental Impacts*

The East Meadow Action Committee contends that the SHW project EIR violates CEQA requirements for a discussion of a project's cumulative environmental impacts. We will begin with a background summary of the cumulative impacts discussion in the SHW project EIR.

### 1. Background

The RDEIR for the SHW project states: "[T]his project-level Revised Draft EIR is tiered from the 2005 LRDP EIR, a program-level EIR that evaluated the cumulative effects of campus development and growth under the 2005 LRDP for a period of approximately 15 years—2005 through 2020. It is appropriate for this EIR to rely on the 2005 LRDP EIR for evaluation of cumulative impacts because the proposed project is

19

within the scope of the growth anticipated and analyzed in the LRDP EIR, and CEQA allows the use of a prior program EIR for this purpose."

The RDEIR also states: "With respect to cumulative impacts stemming from the development footprint of the project, e.g., cumulative impacts on biological and cultural resources, this EIR addresses the increase in cumulative footprint impacts as appropriate, and also demonstrates, with substantial evidence, that the project would not substantially increase the severity of the previously disclosed impact. . . . [¶] This approach is used in all resource sections except water supply, population and housing, and greenhouse gas (GHG) emissions."

The RDEIR's discussion of cumulative impacts was also included in master response No. 5 to comments on the DEIR, which, among other things, states: "As far as future projects on the campus are concerned, the list of projects in RDEIR Table 4.0-1 (p. 4.0-6) shows that there are no reasonably foreseeable projects under the 2005 LRDP that would affect grasslands. Based on projects that have been completed or are planned to be completed under the 2005 LRDP per Table 4.0-1 and the proposed project, development under the 2005 LRDP will affect a total of 23 acres of the 84 acres of annual grassland habitat that was projected to be developed under the 2005 LRDP, including about 17.2 acres of purple needlegrass grassland. Therefore, the development of the Hagar site under the proposed project would not increase the magnitude of the cumulative impact of LRDP development on annual grassland habitats that may support some special-status plant species and provide nesting, foraging, and movement habitat for special-status wildlife species."

The RDEIR's master response No. 5 to comments on the DEIR concluded, with regard to the cumulative impacts of developing the Hagar site, that "[a]s the acreage of habitat affected by the project is within the acreage analyzed in the 2005 LRDP EIR and because the Hagar site is similar to the rest of the meadow/annual grassland areas, the

20

cumulative impacts of the proposed project are adequately addressed by the analysis in the 2005 LRDP EIR and would be less than significant."

Additionally, the SHW project FEIR's response to comments includes the following: "With respect to cumulative impacts stemming from the development of the Hagar site, e.g., cumulative impacts on aesthetics, biological resources, cultural resources, hydrology and water quality, the RDEIR specifically addresses the increase in cumulative footprint impacts, and demonstrates, with substantial evidence, that the project would not substantially increase the severity of the previously disclosed cumulative impacts. As an example, see the discussion of cumulative impacts in Section 4.1, Aesthetics, where the updated cumulative analysis shows that the construction of the project on the Hagar and Heller sites would not exacerbate the previously disclosed cumulative impacts of the 2005 LRDP. Similar explanations and evidence are presented in Section 4.3, Biological Resources, Section 4.4, Cultural Resources, and Section 4.7, Hydrology and Water Quality, of the RDEIR. Also see Master Response 5: Biological Resource Impacts on the East Meadow, which shows that Hagar site development will not increase the magnitude of previously analyzed cumulative biological resource impacts on grassland habitats."

### 2. The Parties' Contentions

East Meadow Action Committee contends that respondents violated the CEQA requirements for the EIR's discussion of cumulative impacts because the cumulative impacts of the SHW project were not adequately addressed in the 2005 LRDP EIR, since the 2005 LRDP did not contemplate development of the East Meadow, and development of the East Meadow is inconsistent with the 2005 LRDP. Further, East Meadow Action Committee argues that the SHW project EIR failed to discuss the cumulative impacts on aesthetics, historical resources, and "conflicts with land use policies," and also failed to discuss the cumulative biological impacts, specifically the impact on grasslands.

21

According to respondents, the SHW project EIR properly analyzed the impacts to wildlife, aesthetic, and visual impacts of development of the Hagar site at project level without reliance on tiering, and the East Action Meadow Committee has not met its burden to show that the analyses are not supported by substantial evidence. Further, respondents point out that the SHW project EIR acknowledged that the 2005 LRDP and 2005 LRDP program EIR did not include development of the Hagar site, and analyzed the cumulative impacts of developing that site.

### 3. Analysis

Under CEQA, "[a]n EIR must 'discuss cumulative impacts of a project when the project's incremental effect is cumulatively considerable,' which "means that the incremental effects of an individual project are significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects. ([Guidelines], §§ 15130, subd. (a), 15065, subd. (a)(3); see § 21083, subd. (b)(2).) An adequate discussion of significant cumulative impacts ordinarily includes either '[a] list of past, present, and probable future projects producing related or cumulative impacts' or '[a] summary of projections contained in an adopted local, regional or statewide plan, or related planning document, that describes or evaluates conditions contributing to the cumulative effect. (Guidelines, § 15130, subd. (b)(1).)" (*Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council* (2010) 190 Cal.App.4th 1351, 1381, fn. omitted, disapproved on another ground in *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457.)

With respect to tiered EIRs, Guidelines, section 15130, subdivisions (d) and (e) provide in part: "A pertinent discussion of cumulative impacts contained in one or more previously certified EIRs may be incorporated by reference pursuant to the provisions for tiering and program EIRs. No further cumulative impacts analysis is required when a project is consistent with a general, specific, master or comparable programmatic plan

22

where the lead agency determines that the regional or areawide cumulative impacts of the proposed project have already been adequately addressed, as defined in section 15152(f), in a certified EIR for that plan. [¶] If a cumulative impact was adequately addressed in a prior EIR for a community plan, zoning action, or general plan, and the project is consistent with that plan or action, then an EIR for such a project should not further analyze that cumulative impact, as provided in Section15183(j)."

"If, on the other hand, the cumulative impact is insignificant or if the project's incremental contribution to the impact is not cumulatively considerable, the Lead Agency is not required to conduct a full cumulative impacts analysis, but the EIR must include a brief explanation of the basis for the agency's finding(s)." (*San Francisco Baykeeper, Inc. v. State Lands Com*. (2015) 242 Cal.App.4th 202, 222.)

The standard of review that applies to the issue of whether an agency adequately determined under CEQA that a project's incremental effect is not cumulatively considerable is substantial evidence. (*Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1358.); see also *San Franciscans for Livable Neighborhoods v. City & County of San Francisco* (2018) 26 Cal.App.5th 596, 622 ["A decision to not identify an impact as significant is reviewed for substantial evidence."].)

The party challenging the agency's findings in the EIR must affirmatively show that there is no substantial evidence in the record to support the agency's findings. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626.) This requires setting forth all of the evidence material to the agency's finding, then showing that the evidence could not reasonably support the finding. (*Ibid*.) "[S]imply pointing to portions of the administrative record" that arguably supports the position of the party challenging the EIR is insufficient. (*Ibid*.)

Here, the East Meadow Action Committee acknowledges in its reply brief that it "is not arguing the sufficiency of the evidence. [Citation.] However, Appellant is arguing that Respondents cannot tier the SHW Project EIR from the 2005 LRDP EIR

23

when it either conflicts [with] the 2005 LRDP EIR and its findings, and is inconsistent with the program and policy adopted in 2005." We understand the East Meadow Action Committee to again argue that tiering in this case, including tiering of the cumulative impacts discussion, violates CEQA because the SHW project's development of the Hagar site in the East Meadow is not consistent with the 2005 LRDP. However, as we have discussed, we disagree and have determined that the record shows that SHW project is consistent with the 2005 LRDP within the meaning of section 21094, subdivision (b).

Accordingly, we further determine that the East Meadow Action Committee has not met its burden to show that the SHW project EIR's discussion of cumulative impacts with respect to the Hagar site is inadequate under CEQA.

## D. *Limited Writ*

East Meadow Action Committee contends that the trial court erred in ordering a limited peremptory writ of mandate that did not direct respondents to set aside their approval of the LRDP amendment designating the East Meadow for development and their certification of the EIR.

### 1. Background

The trial court rejected all of the East Meadow Action Committee's claims of CEQA violations, with one exception. The trial court ruled that the Regents' consideration of the SHW project alternatives violated CEQA, as stated in the court's statement of decision: "When the Court evaluates the findings as it relates to the Regent's rejection of the various alternatives as infeasible, it is apparent that consideration of *costs* were so inextricably intertwined with the claimed other 'social, legal or technological considerations' that ultimately, as demonstrated by the actual transcripts of the Regents' approval of the project, that, the Regents were engaged in nothing other than a cost analysis."

Based on these findings, the trial court concluded that "[u]ltimately, it was determined by the Regents to delegate review of the data, and the cost analysis, to a

24

subcommittee of three of its members. The three members evaluated that (non-public) data, and based upon the recommendations of the three members, without appropriate review of the data itself by the full Board of Regents, the project was approved. The improper delegation to carry out the statutorily required balancing process renders the ultimate approval a violation of CEQA. The petition is therefore granted to the extent it asserts that the Regents' findings regarding the infeasibility of alternatives do not comply with CEQA."

The trial court therefore ordered that a peremptory writ issue setting aside the Regents' project approvals of the SHW project, including (1) the Regents' adoption of the CEQA findings and statement of overriding considerations; (2) the Regents' adoption of the mitigation and reporting program; and (3) the Regents' approval of the design of the SHW project. The trial court also ordered that the peremptory writ direct "the Regents as, a whole, prior to reconsidering approval of the Project and in accordance with the requirements of CEQA, to consider any information regarding the feasibility of. alternatives, including economic information, and take such into account in reconsidering approval of the Student Housing West Project."

The writ of mandate filed on October 30, 2020, also included a stay order directing respondents to "[s]uspend any and all Project activities pursuant to or in furtherance of the determinations, findings and decisions until Respondents have taken the specified actions necessary to bring the determinations, findings and decisions into compliance with CEQA."

## 2. The Parties' Contentions

According to Meadow Action Committee, the trial court's ruling that the Regents' finding of economic infeasibility of the SHW project alternatives did not comply with CEQA is so inextricably intertwined with the SHW project EIR and the amendment to the 2005 LRDP that the certification of the EIR and the amendment should should also be set aside.

25

Respondents maintain that "[t]his writ was appropriately tailored to the specific violation found by the trial court—that The Regents adopted the CEQA findings without the full board's consideration of the feasibility of alternatives." Further, respondents assert that "[t]he writ also required The Regents to set aside the design approval and the [mitigation monitoring and reporting program] for the Project, in order to avoid prejudice to the ability of The Regents, following consideration of the evidence for the feasibility of alternatives, to potentially give design approval to a different alternative, to which a different set of mitigation measures would apply. [Citation.] The trial court also ensured that there would be no adverse change to the environment during this time by mandating that The Regents suspend all Project activities pending reconsideration of the Project approval in compliance with CEQA."

### 3. Analysis

We agree with respondents that the trial court did not err in fashioning a writ that is limited in scope. The trial court's discretion in remedying a CEQA error is set forth in section 21168.9, subdivisions (a) and (b).[10] "CEQA, through the Public Resources Code,

---

[10] Section 21168.9, subdivision (a) provides in part: "If a court finds, as a result of a trial, hearing, or remand from an appellate court, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following: [¶] (1) A mandate that the determination, finding, or decision be voided by the public agency, in whole or in part. [¶] . . . [¶] (3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division."

Section 21168.9, subdivision (b) provides: "Any order pursuant to subdivision (a) shall include only those mandates which are necessary to achieve compliance with this division and only those specific project activities in noncompliance with this division. The order shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with this division. However, the order shall be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with this division, and (3) the court has not found the remainder of the project to be in noncompliance with this division."

26

allows a trial court to leave project approvals in place. After a court finds a CEQA error, the court has three options: void a decision in whole or part; suspend certain project activities; or take other specified actions. ([§] 21168.9, subd. (a).) CEQA does not require the court, on finding CEQA error, to void all project approvals. The plain language of section 21168.9 grants the trial court the discretion to leave project approvals in place. [Citations.]" (*Central Delta Water Agency v. Department of Water Resources* (2021) 69 Cal.App.5th 170, 205 (*Central Delta Water Agency*).)

In other words, " '[s]ection 21168.9 was enacted in 1984 to give the trial courts some flexibility in tailoring a remedy to fit a specific CEQA violation.' [Citation.]" (*Center for Biological Diversity v. Department of Fish & Wildlife* (2017) 17 Cal.App.5th 1245, 1253.) Accordingly, " 'section 21168.9 . . . "expressly authorizes the court to fashion a remedy that permits some part of the project to go forward while an agency seeks to remedy its CEQA violations." ' [Citation.]." (*Id.* at p. 1255.) "We review the trial court's exercise of its equitable powers [under section 21168.9] for abuse of discretion." (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App 4th 260, 287; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 423 [applying traditional equitable principles in deciding whether injunctive relief is an appropriate remedy under section 21168.9].)

In this case, the trial court ruling that the Regents had violated CEQA by improperly rejecting the alternatives to the SHW project as economically infeasible on the basis of a non-public cost analysis that was delegated to a three-member committee. The merits of that ruling are not at issue in this appeal. The trial court therefore ordered that a peremptory writ issue directing the Board of Regents as a whole to correct the CEQA error by reconsidering the Regents' approvals of the SHW project and the feasibility of the project alternatives, and stayed all SHW project activities until the Regents complied with the peremptory writ. East Meadow Action Committee has not met its burden to show that the trial court abused its discretion in limiting the scope of the

27

peremptory writ to a correction of the sole CEQA error found by the court and staying SHW project activities until the error is corrected. As we have discussed, the trial court has the discretion under the plain language of section 21168.9 to leave project approvals in place after finding a CEQA error. (See *Central Delta Water Agency*, *supra*, 69 Cal.App.5th at p. 204.)

For these reasons, we find no merit in East Meadow Action Committee's contention that the trial court erred in limiting the scope of the peremptory writ. Having concluded that East Meadow Action Committee's other contentions on appeal also lack merit, we will affirm the judgment.

## IV. DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
WILSON, J.

*East Meadow Action Committee v. Regents of the University of California*
**H048695**